**Jofama COLEMAN, Petitioner,**

v.

**Kathleen ALLISON, Acting Warden, Respondent.**

**Case No. LA CV 10–02343–VBF (RNB).**

United States District Court, C.D. California.

Signed May 28, 2015.

Filed June 1, 2015.

Jesse Asher Gessin, Federal Public Defender's Office, Santa Ana, CA, for Petitioner.

James W. Bilderback, II, David Elgin Madeo, CAAG–Office of Attorney General, Los Angeles, CA, for Respondent.

ORDER ACCEPTING FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

VALERIE BAKER FAIRBANK,
District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the pleadings, records on file herein, and the Supplemental Report and Recommendation of the United States Magistrate Judge. Further, the Court has engaged in a *de novo* review of those portions of the Supplemental Report and Recommendation to which objections have been made. The Court accepts the findings and recommendations of the Magistrate Judge. IT THEREFORE IS ORDERED that (1) petitioner's Motion to Amend with respect to Grounds 10–21 of the proposed Amended Petition is denied; and (2) Judgment be entered dismissing this action with prejudice.

SUPPLEMENTAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate Judge.

This Supplemental Report and Recommendation is submitted to the Honorable Valerie Baker Fairbank, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

PROCEEDINGS

On March 31, 2010, petitioner filed a *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein. The Petition purported to allege six grounds for relief that, according to the Petition, had previously been exhausted in a Petition for Review to the California Supreme Court. The Petition included an attached brief ("Pet. Attach.") in support of petitioner's six grounds for relief.

Concurrently with the filing of the Petition, petitioner filed a "Motion to Stay Adjudication of Habeas Corpus Petition to

Allow Petitioner to Properly Exhaust Unexhausted Federal Claims." The Motion to Stay listed nine additional ineffective assistance of trial counsel claims that petitioner indicated he wanted to raise herein, but were not yet properly exhausted.

Although petitioner stated in the Motion to Stay that his stay-and-abeyance request was being made pursuant to *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), under the Ninth Circuit's decision in *King v. Ryan*, 564 F.3d 1133 (9th Cir.), *cert. denied*, 558 U.S. 887, 130 S.Ct. 214, 175 L.Ed.2d 148 (2009), the Court's consideration of the motion to stay petitioner's fully exhausted petition was not governed by *Rhines*. Rather, petitioner's stay motion was governed by the stay and abeyance procedure approved in *Calderon v. United States Dist. Court (Taylor)*, 134 F.3d 981, 987–88 (9th Cir.), *cert. denied*, 525 U.S. 920, 119 S.Ct. 274, 142 L.Ed.2d 226 (1998), and *Kelly v. Small*, 315 F.3d 1063, 1070 (9th Cir.2004), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143, 1149 (9th Cir.2007). Thus, the fact that petitioner had not even purported to make the showing of good cause required under *Rhines* was not dispositive of petitioner's stay motion, since the *Rhines* "good cause" limitation does not apply to the *"Kelly* procedure." Under the *Kelly* procedure, a federal district court has the discretion to stay and hold in abeyance a fully exhausted petition in order to provide the petitioner with the opportunity to proceed to state court to exhaust his unexhausted claims. Then, once the claims have been exhausted in state court, the petitioner may return to federal court and amend his stayed federal petition to include the newly exhausted claims.

*See Kelly*, 315 F.3d at 1070–71; *see also Jackson v. Roe*, 425 F.3d 654, 661 (9th Cir.2005); *James v. Pliler*, 269 F.3d 1124, 1126–27 (9th Cir.2001); *Anthony v. Cambra*, 236 F.3d 568, 575 (9th Cir.2000), *cert. denied*, 533 U.S. 941, 121 S.Ct. 2576, 150 L.Ed.2d 739 (2001); *Taylor*, 134 F.3d at 987–88.[1]

Prior to ruling on petitioner's stay motion, the Court decided to afford respondent the opportunity to be heard. Accordingly, the Court ordered service of the Petition and petitioner's stay motion on respondent, and set a deadline for the filing of respondent's opposition (if any) to the stay motion.

In her ensuing opposition, respondent contended that petitioner's stay motion should be denied because, for statute of limitations purposes, the nine additional ineffective assistance of trial counsel claims that petitioner indicated in his stay motion he wanted to raise herein did not relate back to the exhausted claims alleged in the Petition, and a stay therefore would be futile. However, respondent was not contending that any of petitioner's unexhausted ineffective assistance of counsel claims currently was time barred. According to respondent, the one-year limitation period did not commence running until June 30, 2009. Consequently, it appeared that, when petitioner filed the first of his two pending California Supreme Court habeas petitions on February 1, 2010, five months of the limitation period still remained. Moreover, respondent had conceded that "the period of limitations appear[ed] to be tolled presently." Accordingly, unless the California Supreme Court expressly denied both pending ha-

---

1. However, for purposes of satisfying the one-year statute of limitations imposed by 28 U.S.C. § 2244(d), the newly exhausted claims do not necessarily relate back to the filing of the original Petition. *See King*, 564 F.3d at 1140–41; *see also Mayle v. Felix*, 545 U.S. 644, 664, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).

beas petitions for untimeliness, it appeared to the Court that petitioner would have five months from the denial of those petitions to amend his pending federal habeas petition to add any of the newly exhausted claims that currently were pending before the California Supreme Court.

While it was conceivable that, by the time petitioner sought leave to amend his pending federal habeas petition, the limitations period *might* have run with respect to one or more of the claims that petitioner was seeking leave to add, it could not be said with certainty as of the time the opposition was filed that a stay would be futile. Nor did it make any difference that petitioner's then pending California Supreme Court habeas petitions did not include all nine of the ineffective assistance of counsel claims that petitioner indicated in his stay motion he wanted to raise herein. Since the limitation period still had nearly two months to run, petitioner still had time to either add those claims to one of his pending California Supreme Court habeas petitions or file a new California Supreme Court habeas petition that included those claims.

Accordingly, the Court decided to exercise its discretion under *Kelly* with respect to petitioner's stay motion, by granting it on certain conditions that were specified in an Order issued on May 7, 2010. The Court stated in its Order that its granting of petitioner's motion was without prejudice to respondent opposing a later motion to amend by petitioner on the ground that one or more of the claims that petitioner was seeking to add was time barred.

On October 7, 2010 (proof of service date), petitioner constructively filed a document captioned "Motion to Amend Petitioner's Habeas to Add Newly Exhausted Claims." Concurrently, petitioner lodged what the Court presumed was intended as

his proposed Amended Petition. However, it was unclear to the Court from its review of the proposed Amended Petition whether petitioner had decided to abandon the six grounds for relief alleged in his original Petition. It also was unclear to the Court precisely what claims petitioner now was purporting to allege. The Court therefore issued an Order on October 19, 2010 requiring petitioner to lodge a revised proposed Amended Petition that (a) set forth all of his grounds for relief in the habeas form itself (including additional copies of p. 6 if he had more than five separate grounds), and (b) if the proposed Amended Petition form referenced any attached writ or supporting memorandum in setting forth any of those grounds, specified the pages in the attached document that applied to each of the stated grounds for relief.

On November 17, 2010, petitioner lodged another proposed Amended Petition (hereinafter "Am. Pet.") that rectified the deficiencies about which the Court had apprised petitioner in its October 19, 2010 Order re Further Proceedings. Accordingly, the Court set deadlines for respondent to file either opposition to petitioner's Motion to Amend or a notice of non-opposition thereto, and for petitioner to file a reply if respondent did file opposition.

Respondent filed opposition ("Opp.") to the Motion to Amend on December 21, 2010. Petitioner filed a Reply ("Reply") thereto on January 20, 2011.

On February 9, 2011, the Court issued a Report and Recommendation in which it recommended that petitioner's Motion to Amend be granted in part and denied in part. The Court found that: (a) except for Grounds 11 and 19, none of the new claims alleged in the Amended Petition related back to the filing of petitioner's original Petition; (b) unless a basis for tolling the statute existed, petitioner's last

day to file a federal habeas petition containing his unrelated claims was June 30, 2010; (c) petitioner had not met his burden of demonstrating that statutory tolling rendered the lodging for filing of the Amended Petition herein timely; and (d) petitioner was not entitled to any equitable tolling of the limitation period. The Court further found that recent Ninth Circuit precedent, including *Lee v. Lampert,* 610 F.3d 1125, 1128–31 (9th Cir.2010), foreclosed petitioner's reliance on an "actual innocence" exception to the AEDPA statute of limitations. Accordingly, the Court recommended that petitioner's Motion to Amend be granted with respect to Grounds 1–9, 11, and 19 of the proposed Amended Petition and denied with respect to Grounds 10, 12–18, and 20–21 of the proposed Amended Petition.

The Court was unaware at the time it issued its Report and Recommendation that, the day before, the Ninth Circuit had decided to rehear *en banc* the *Lee* case and decreed that the panel decision could not be cited as precedent in this Circuit. The Court therefore concluded that it would be necessary to issue a Supplemental Report and Recommendation further addressing petitioner's actual innocence claim (which would also apply to respondent's contention in respondent's Opposition Memorandum that petitioner's claims were procedurally defaulted).

Based on the ensuing Supplemental Opposition Memorandum filed by respondent and petitioner's Supplemental Reply Memorandum thereto, the Court issued an Order re Further Proceedings on June 20, 2011. The Order advised of the Court's conclusion that petitioner might be able "to muster a plausible factual case meeting the exacting gateway standard established by the Supreme Court in *Schlup* for overriding a petitioner's clear failure to meet deadlines and requirements for filing

a timely petition in federal court" and that petitioner's actual innocence claim therefore could not be determined without the Court conducting an evidentiary hearing. *See Majoy,* 296 F.3d at 775. The Court noted that, if it held such an evidentiary hearing and concluded that petitioner had met his burden under *Schlup,* such conclusion would also be dispositive of respondent's contention that petitioner's additional claims were procedurally defaulted because the law was well established that there was an actual innocence exception to the procedural default doctrine. However, the need to conduct an evidentiary hearing on petitioner's actual innocence claim (which would necessitate the appointment of counsel for petitioner) and to reach the merits of his additional claims would be obviated if the Ninth Circuit were to issue its *en banc* decision in *Lee v. Lampert* in the meantime and rule that there was no actual innocence exception to the AEDPA statute of limitations. The Court further noted that Grounds 1–6 of petitioner's original Petition, which now corresponded to Grounds 1–9 of petitioner's proposed Amended Petition, (a) were not subject to a time bar defense, and (b) were subject to the AEDPA standard of review since those claims were adjudicated on the merits. The Court further noted that the AEDPA required that the Court evaluate the reasonableness of the California court's adjudication of those claims on the basis of the record before the state courts. Accordingly, the Court advised, it had decided to: (a) defer ruling on petitioner's Motion to Amend the Petition to add 12 new claims, and (b) instead bifurcate the proceeding by first adjudicating petitioner's original 6 claims (which corresponded to Grounds 1–9 of his proposed Amended Petition). The Court therefore granted petitioner's Motion to Amend, but only to the extent that it sought to amend Grounds 1–6 of petitioner's original Peti-

tion by realleging instead Grounds 1–9 of petitioner's proposed Amended Petition.

Petitioner subsequently filed objections to the June 20, 2011 Order re Further Proceedings. While his objections were pending before the then-assigned District Judge, the Ninth Circuit issued its *en banc* decision in *Lee v. Lampert,* 653 F.3d 929 (9th Cir.2011). The Ninth Circuit ruled that a credible claim of actual innocence did constitute an exception to the AEDPA statute of limitations. Based on the *en banc* decision, the District Judge issued a Minute Order on October 13, 2011 wherein he noted that the Ninth Circuit *en banc* decision vitiated this Court's rationale for deferring its ruling on the part of petitioner's Motion to Amend seeking to add Grounds 10–21 of the proposed Amended Petition. To that extent, the then-assigned District Judge sustained petitioner's objections to the June 20, 2011 Order and remanded the matter back to this Court for further proceedings based on the *en banc* decision in *Lee.*

On remand from the District Judge, the Court issued another Order re Further Proceedings on October 19, 2011. The Court advised therein that it remained the Court's view that, in order to rule on petitioner's Motion to Amend (and specifically the portion as to which the Court previously had deferred ruling), it would be necessary to conduct an evidentiary hearing on petitioner's actual innocence claim. The Court therefore appointed the Federal Public Defender to represent petitioner for purposes of such evidentiary hearing. The Court further advised that it also remained the Court's view that the need to conduct an evidentiary hearing on petitioner's actual innocence claim had no bearing on the Court's determination of Grounds 1–6 of petitioner's original Petition, which now corresponded to Grounds 1–9 of petitioner's proposed Amended Petition. Ac-

cordingly, the Court advised that its appointment of counsel for petitioner did not extend to those claims, which were not subject to a time bar defense or a procedural default defense, and which appeared to be subject to the AEDPA standard of review on the basis of the record before the state courts. The Court also advised that the part of the Court's June 23, 2011 Order granting petitioner's Motion to Amend, to the extent that the Motion to Amend sought to amend Grounds 1–6 of petitioner's original Petition by realleging instead Grounds 1–9 of petitioner's Amended Petition, would stand. Further, the Court advised, since the Court ultimately would have to reach the merits of those claims, no matter how it decided petitioner's actual innocence claim, there was no reason to delay the briefing of those claims.

Respondent filed an Answer to Grounds 1–9 of the Amended Petition ("Ans.") on December 12, 2011, accompanied by a Memorandum of Points and Authorities ("Ans. Mem."). Following multiple extensions of time, petitioner filed a "Traverse in Response to Respondent's Answer to Amended Petition" on April 3, 2012 ("Trav."). Petitioner then filed, on April 25, 2012, a Motion to Expand the Record.

In its Partial Report and Recommendation issued herein on June 21, 2012, the Court recommended that Grounds 1–9 of petitioner's Amended Petition be denied. Following multiple extensions of time, petitioner filed objections to the Partial Report and Recommendation on September 12, 2012. The then-assigned District Judge issued an Order on February 12, 2013 accepting the findings and recommendations of the Magistrate Judge with respect to Grounds 1–9 of the Amended Petition. The District Judge denied petitioner's Motion to Expand the Record and request for an evidentiary hearing insofar

as the Motion and request related to Grounds 1–9 of the Amended Petition, and denied Grounds 1–9 of the Amended Petition. The District Judge also denied petitioner's request for a Certificate of Appealability with respect to 12 issues relating to the Partial Report and Recommendation.

At a status conference held on April 4, 2013, the Court ordered counsel to submit a proposed schedule for the evidentiary hearing on petitioner's actual innocence claim as an equitable exception to the statute of limitations, for the filing of witness lists and exhibit lists, and for each side's objections to the other side's proposed evidence. In accordance with the ensuing stipulation filed by the parties, the Court set the matter for an evidentiary hearing on December 6, 2013 and also set the related deadlines.[2] At the request of the parties, the evidentiary hearing subsequently was continued to March 18, 2014. However, it then became necessary to continue that date pending the District Judge's determination of petitioner's objections to the Court's January 8, 2014 rulings on respondent's objections to petitioner's witness list and on related evidentiary issues. After the District Judge issued an Order on March 11, 2014 affirming

this Court's January 8, 2014 rulings, the Court reset the evidentiary hearing for August 13, 2014. The hearing took place on that date and, at its conclusion, the Court set a post-hearing briefing schedule.

On October 15, 2014, petitioner filed a Post–Hearing Brief ("Pet. PH Brief"),[3] which included objections to the February 9, 2011 Report and Recommendation. Respondent filed his Post–Hearing Brief ("Resp. PH Brief"), including a response to petitioner's objections to the February 9, 2011 Report and Recommendation, on November 17, 2014. Petitioner filed a Reply thereto ("Pet. PH Reply Brief") on November 25, 2014.

Thus, the record before the Court is now fully developed with respect to the issue of whether petitioner's Motion to Amend should be granted with respect to Grounds 10–21 of the proposed Amended Petition. For the reasons discussed hereafter, the Court now recommends (a) that petitioner's Motion to Amend be denied with respect to Grounds 10, 12–18, and 20–21 of the proposed Amended Petition because amendment would be futile since those claims are time barred; (b) that petitioner's Motion to Amend be denied with re-

---

2. During this period of time, the Court also granted petitioner's ex parte application to expand the appointment of counsel to the remaining claims alleged in the proposed Amended Petition.

3. The Court notes that, in his Post–Hearing Brief, petitioner asserts (without citing any of his filings) that his "actual innocence [sic] is being presented as a free standing claim, a justification for tolling, and a justification against procedural default." (See Pet. PH Brief at 2 n. 1.) However, petitioner did not allege a free standing actual innocence claim in either his original Petition or his Amended Petition herein. Nor did he present a free standing actual innocence claim in any of his California Supreme Court filings. Because 28 U.S.C. § 2254(b)(1) precludes the granting

of habeas relief on an unexhausted claim, the Court has decided to exercise its discretion not to consider this unexhausted free standing actual innocence claim that has been raised for the first time in petitioner's Post–Hearing Brief. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507–08 (9th Cir.1994) (observing that "[a] Traverse is not the proper pleading to raise additional grounds for relief"), cert. denied, 514 U.S. 1026, 115 S.Ct. 1378, 131 L.Ed.2d 232 (1995); see also Lopez v. Dexter, 375 Fed.Appx. 724, at *1 (9th Cir.2010) (now citable for its persuasive value pursuant to Ninth Circuit Rule 36–3) (ruling that district court had appropriately rejected petitioner's claim on the basis that it improperly surfaced for the first time in his Traverse to the state's Answer).

spect to Ground 11 of the proposed Amended Petition because amendment would be futile since that claim is procedurally defaulted; and (c) that petitioner's Motion to Amend be denied with respect to Ground 19 of the proposed Amended Petition because amendment would be futile since that claim is devoid of merit.

## PROCEDURAL HISTORY

On April 28, 2006, petitioner was convicted by a Los Angeles County Superior Court jury of first degree murder. (*See* 5 Reporter's Transcript on Appeal ["RT"] 3603–06; 1 Clerk's Transcript ["CT"] 186–88.) On August 16, 2007, after hearing and denying petitioner's motion for a new trial based on juror misconduct and insufficiency of the evidence, the trial court sentenced petitioner to state prison for an indeterminate term of 25 years to life. (*See* 5 RT 3901–09; 2 CT 302–04.)

Petitioner appealed from the judgment of conviction, raising claims generally corresponding to the third, fourth, fifth, and sixth grounds for relief alleged in petitioner's original Petition herein (which encompass Grounds 4–9 of petitioner's Amended Petition). (*See* respondent's Notice of Lodging, Lodged Document ["LD"] A, C.) On December 30, 2008, in an unpublished decision, the California Court of Appeal rejected petitioner's claims and affirmed the judgment. (*See* LD D, E.)

While his direct appeal was pending, petitioner (through counsel) filed a petition for writ of habeas corpus in the California Court of Appeal, in which he alleged claims generally corresponding to the first and second grounds for relief alleged in petitioner's original Petition herein (which encompass Grounds 1–3 of petitioner's Amended Petition). (*See* LD F.) Following respondent's filing of an informal response at the Court of Appeal's direction (*see* LD G), and petitioner's letter reply thereto (*see* LD H), the Court of Appeal issued an Order on December 30, 2008 (the same date as its decision on direct appeal) denying petitioner's habeas petition, in part with a reasoned decision. (*See* LD I.) [4]

On February 11, 2009, petitioner (through counsel) petitioned the California Supreme Court for review of the Court of Appeal's decision on direct appeal. (*See* LD J.) Concurrently, he also (through counsel) petitioned the California Supreme Court for review of the Court of Appeal's denial of his habeas petition. (*See* LD L.) On April 1, 2009, the California Supreme Court issued separate orders summarily denying both petitions without comment or citation of authority. (*See* LD K, M, N.)

On or about December 1, 2009, petitioner constructively filed a *pro se* motion in the trial court requesting post-conviction discovery, which the trial court denied on December 7, 2009. (*See* Exhibits to LD O.) Petitioner then constructively filed a *pro se* habeas petition in the California Supreme Court on January 6, 2010 (proof of service date),[5] in which the sole claim

---

**4.** Petitioner (through counsel) also filed a Petition for Rehearing of the order denying petitioner's habeas petition in the Court of Appeal on January 13, 2009, which apparently was denied on January 23, 2009. Petitioner argued therein that the order relied on "incorrect facts and facts that are not supported by the record to find that [petitioner] was not prejudiced by juror misconduct." (*See* Trav. at 7, Exh. A at 1; LD J at 1 (in his Petition for Review to the California Supreme Court,

counsel states that the Petition for Rehearing was denied on January 23, 2009).)

**5.** The Ninth Circuit has held that the prison mailbox rule applies to a *pro se* habeas petitioner's state and federal filings. *See, e.g., Smith v. Duncan,* 297 F.3d 809, 814 (9th Cir.2002); *Huizar v. Carey,* 273 F.3d 1220, 1223 (9th Cir.2001).

alleged was that the trial court had erred in denying petitioner's motion for post-conviction discovery. (*See* LD O.) This claim generally corresponds to Ground 21 of the proposed Amended Petition herein.

While that California Supreme Court habeas petition was pending, petitioner constructively filed another habeas petition in the California Supreme Court on or about March 25, 2010 (signature date). Petitioner alleged therein claims that generally correspond to Grounds 10–20 of petitioner's proposed Amended Petition herein. (*See* LD Q.)

While both of his California Supreme Court habeas petitions were pending, petitioner filed his original Petition herein on March 31, 2010. The signature date on the Petition, and thus the earliest date on which it could have been turned over to the prison authorities for mailing, was March 25, 2010.

In two separate orders issued on September 15, 2010, the California Supreme Court summarily denied both of petitioner's habeas petitions, in each case citing *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993). (*See* LD T, U.)[6]

**THE REMAINING CLAIMS ALLEGED IN PETITIONER'S PROPOSED AMENDED PETITION**

As noted above, the Court previously granted petitioner's Motion to Amend, to the extent that the Motion to Amend sought to amend Grounds 1–6 of petitioner's original Petition by realleging instead

Grounds 1–9 of petitioner's Amended Petition. The Court subsequently issued a Partial Report and Recommendation in which it recommended that Grounds 1–9 of petitioner's Amended Petition be denied. The Court's findings and recommendations in the Partial Report and Recommendation ultimately were accepted by the then-assigned District Judge.

The remaining claims alleged in petitioner's proposed Amended Petition, as to which the Court deferred ruling on petitioner's Motion to Amend, are as follows:

10. The trial court's failure to bifurcate the proceedings denied petitioner due process of law. (*See* Am. Pet. at 6b; *see also* Am. Pet. Attach. at 66–81.)

11. The prosecution's introduction of bad character evidence during its case in chief constituted evidentiary error. (*See* Am. Pet. at 6b; *see also* Am. Pet. Attach. at 82–85.)

12. Trial counsel provided ineffective assistance by failing to investigate and assert a crucial or potentially meritorious alibi and/or mistaken identity defense relating to the time petitioner arrived at the video store. (*See* Am. Pet. at 6c; *see also* Am. Pet. Attach. at 86–105.)

13. The prosecutor committed misconduct by making false and/or misleading statements during closing argument. (*See* Am. Pet. at 6c; *see also* Am. Pet. Attach. at 106–11.)

14. Trial counsel provided ineffective assistance by failing to object to the

---

**6.** On November 1, 2011, petitioner constructively filed another *pro se* habeas petition in the California Supreme Court, which the California Supreme Court summarily denied on March 14, 2012 with citations to *In re Robbins*, 18 Cal.4th 770, 780, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998) and *In re Clark*, 5 Cal.4th at 767–69, 21 Cal.Rptr.2d 509, 855 P.2d 729. Those citations signified that the petition was being denied for untimeliness. *See, e.g., Ben-*

*nett v. Mueller*, 322 F.3d 573, 581–83 (9th Cir.) (recognizing California's untimeliness bar is represented by citations to *In re Robbins* and *In re Clark*), *cert. denied*, 540 U.S. 938, 124 S.Ct. 105, 157 L.Ed.2d 251 (2003). In any event, it appears from the Court's review of the petition that it was not directed to the same Superior Court conviction underlying the Petition herein. (*See* LD X.)

prosecutor's false and/or misleading statements. (*See* Am. Pet. at 6c; *see also* Am. Pet. Attach. at 112–15.)

15. Trial counsel provided ineffective assistance in failing to file a *Pitchess* motion, and failing to seek and use information bearing on the credibility of the police officer witnesses and prosecution witnesses Robles and Lopez. (*See* Am. Pet. at 6d; *see also* Am. Pet. Attach. at 116–24.)

16. Trial counsel provided ineffective assistance in failing to secure the services of a psychologist to testify regarding the psychological factors that affect the accuracy of eyewitness identifications. (*See* Am. Pet. at 6d; *see also* Am. Pet. Attach. at 12480.)

17. Trial counsel deprived petitioner of a crucial or potentially meritorious defense by failing to put on demonstrative evidence and/or failing to make a motion for the jury to be taken to the scene and placed under the same identifying circumstances as the prosecution's witnesses, which would have proven that all of the witnesses lied and fabricated their stories. (*See* Am. Pet. at 6d; *see also* Am. Pet. Attach. at 180–83.)

18. Trial counsel deprived petitioner of a crucial or potentially meritorious defense by failing to investigate adequately the legal and factual grounds for making a motion to exclude Lopez's in-court identification of petitioner. (*See* Am. Pet. at 6e; *see also* Am. Pet. Attach. at 184–87.)

19. Trial counsel provided ineffective assistance by failing to make a motion to exclude Renteria's "suggestive" and/or tainted in-court identification testimony. (*See* Am. Pet. at 6e; *see also* Am. Pet. Attach. at 187–209.)

20. The cumulative effect of the errors operated to produce a fundamentally unfair trial, in violation of petitioner's federal constitutional right to due process. (*See* Am. Pet. at 6e; *see also* Am. Pet. Attach. at 209–13.)

21. The trial court erred in denying petitioner's motion for postconviction discovery. (*See* Am. Pet. at 6f; *see also* Am. Pet. Attach. at 213–21.)

## DISCUSSION

**I. Petitioner's Motion to Amend should be denied with respect to Grounds 10, 12–18, and 20–21 of the proposed Amended Petition because those claims are time barred and amendment therefore would be futile.**

■ Since petitioner's original Petition was filed after the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") on April 24, 1996, it is subject to the AEDPA's one-year limitation period, as set forth at 28 U.S.C. § 2244(d). As noted above, where a district court stays a fully exhausted petition pursuant to the *Kelly* procedure, the newly exhausted claims do not necessarily relate back to the filing of the original Petition for purposes of satisfying the one-year statute of limitations.[7]

---

7. In his Post–Hearing Brief, which as noted above included objections to the February 9, 2011 Report and Recommendation, petitioner contends that this Court's denial of petitioner's motion for a *Rhines* stay was invalid and void under 28 U.S.C. § 636(b) and Fed. R.Civ.P. 72 because it was a dispositive ruling. (*See* Pet. PH Brief at 17–18.) This objection is spurious. In the face of petitioner's

filing of his "Motion to Stay Adjudication of Habeas Corpus Petition to Allow Petitioner to Properly Exhaust Unexhausted Federal Claims," the Court merely observed in its April 5, 2010 Order re Further Proceedings that, although petitioner stated in the Motion to Stay that his stay-and-abeyance request was being made pursuant to *Rhines*, under the Ninth Circuit's decision in *King*, the

In respondent's original opposition to petitioner's Motion to Amend, respondent first addressed the timeliness of the proposed Amended Petition and then addressed the issue of whether, for purposes of the one-year statute of limitations, the new claims alleged in the Amended Petition relate back to the claims alleged in petitioner's original Petition. However, since respondent has never .disputed that the original Petition was timely filed, the Court has decided to address the relation back issue first.

**A.** *Except for Grounds 11 and 19, none of the new claims alleged in the Amended Petition relates back to the filing of petitioner's original Petition.*

■ Under *Mayle*, 545 U.S. at 662, 125 S.Ct. 2562, claims asserted after the one-year limitation period has expired do not relate back "simply because they relate to the same trial, conviction, or sentence as a timely filed claim." The Supreme Court held that "[a]n amended habeas petition does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ. in both time and type from those the original pleading set forth." *Id.* at 650, 125 S.Ct. 2562. Only if "the original and amended petitions state claims that are tied to a common core of operative facts" will relation back be in order. *See id.* at 664, 125 S.Ct. 2562.

Thus, in *Mayle*, the Supreme Court concluded that the petitioner's amended petition, which raised a Fifth Amendment claim directed to the admission of evidence of his pretrial statements, did not relate back to his original petition, which raised only a Sixth Amendment confrontation clause claim directed to the admission of videotaped witness testimony. *See Mayle*, 545 U.S. at 648–49, 125 S.Ct. 2562. The two claims were "separated in time and type" because the new claim arose from petitioner's own pretrial statements and the original claim arose from another witness's videotaped statements. *See id.* at 657, 125 S.Ct. 2562; *see also, e.g., Schneider v. McDaniel,* 674 F.3d 1144, 1150–52 (9th Cir.) (claim challenging trial court's denial of severance motion did not relate

Court's consideration of the motion to stay petitioner's fully exhausted petition was not governed by *Rhines*, but rather was governed by the *Kelly* procedure. Thus, the fact that petitioner had not even purported to make the showing of good cause required under *Rhines* was not dispositive of petitioner's stay motion, since the *Rhines* "good cause" limitation did not apply to the *"Kelly* procedure." Ultimately, after considering respondent's opposition, the Court granted petitioner's stay motion. Petitioner does not even purport to dispute that the *Rhines* stay procedure only applies to mixed petitions containing both exhausted and unexhausted claims. Instead, he appears to be contending that the Court should have treated his fully exhausted original Petition as if it was a mixed petition because petitioner filed his stay motion concurrently with his original Petition and he attached as an exhibit to his stay motion an unconformed copy of what purported to be a California Supreme Court habeas petition in which he had presented his unexhausted claims. (*See* Pet. PH Brief at 11–12.) The fallacy of this contention is that petitioner could have included his unexhausted claims in his original Petition and concurrently sought a stay that· would have been governed by *Rhines*. The Court then would have been compelled to recommend the denial of petitioner's stay motion based on his failure to even purport to make the requisite showing of good cause and the dismissal of his mixed petition for failure to exhaust state remedies, unless petitioner withdrew his unexhausted claims. Since petitioner chose not · to include his unexhausted claims in his original Petition filed concurrently with his stay motion, there was no need for the Court even to reach the issue of whether petitioner had made the requisite showings for a *Rhines* stay or issue a Report and Recommendation recommending the denial of his stay motion.

back to original ineffective assistance of counsel claim for failing to file timely motion for severance), *cert. denied,* 568 U.S. 1001, 133 S.Ct. 579, 184 L.Ed.2d 380 (2012); *Rhoades v. Henry,* 598 F.3d 511, 520 (9th Cir.2010) (prosecutorial misconduct claims did not relate back to claims alleged in original petition concerning police misconduct, jailhouse informant testimony, and alleged judicial bias); *Hebner v. McGrath,* 543 F.3d 1133 (9th Cir.2008), *cert. denied,* 557 U.S. 906, 129 S.Ct. 2791, 174 L.Ed.2d 294 (2009) (claim challenging jury instruction concerning prior sexual misconduct given at close of evidence did not relate back to claim alleged in original petition challenging only the admissibility at trial of evidence of that conduct).

Here, petitioner alleged the following six grounds for relief in his original Petition:

1. Petitioner's constitutional right to due process of law and a fair trial was violated "when false evidence was introduced at trial during the testimony of Maria Renteria." (*See* Pet. at ¶ 7.a; *see also* Attached Memorandum of Points and Authorities ("Pet. Attach.") at 17–22.)

2. Ineffective assistance of counsel when "counsel failed to investigate the fact[s], to present evidence that Renteria was 128 feet away, to present evidence that it is impossible to see the driver under the circumstances Renteria described, [and] to adequately question Renteria and produce impeachment evidence." (*See* Pet. at ¶ 7.b; *see also* Pet. Attach. at 22–27.)

3. Petitioner's constitutional rights to a fair trial, an impartial jury, and due process were violated when "the jury received prejudicial information about petitioner's prior criminal history that had not been presented at trial during its deliberations." (*See* Pet. at ¶ 7.c; *see also* Pet. Attach. at 27–29, 30–38, 44–54.)

4. Prosecutorial misconduct when "the prosecutor placed before the jury inadmissible evidence about petitioner's criminal history, [and] also reference[d] petitioner having been booked/arrested" several times during the examination of Deputy Steven Marella. (*See* Pet. at ¶ 7.d; *see also* Pet. Attach. at 38–42.)

5. Jury misconduct based on the jury's inadvertent receipt of petitioner's criminal history. (*See* Pet. at ¶ 7.e.)

6. Ineffective assistance of trial counsel when trial counsel failed to object to the evidence of petitioner's criminal history. (*See* Pet. at ¶ 7.f; *see also* Pet. Attach. at 42–44.)

■ The first and second grounds related to Renteria's testimony, and specifically her ability to perceive the matters about which she testified, including her identification of petitioner. Of the twelve new claims alleged in the proposed Amended Petition, only one related to Renteria's testimony and even arguably is tied to the same common core of operative facts as the first and second grounds for relief alleged in petitioner's original Petition. In Ground 19 of his proposed Amended Petition, petitioner claims that trial counsel provided ineffective assistance by failing to make a motion to exclude Renteria's "suggestive" and/or tainted in-court identification testimony. Based on its comparison of the facts stated in support of Ground 19 of the proposed Amended Petition to the facts stated in support of the first two grounds for relief alleged in the original Petition, the Court finds that the *Mayle* standard for relation back is met with respect to Ground 19 of the Amended Petition.

■ The remaining grounds for relief alleged in the original Petition related to (a) the jury's consideration during deliberations of an exhibit that reflected petition-

er's criminal history record, and (b) the prosecutor's reference to petitioner having been "booked/arrested" several times during the examination of Deputy Steven Marella. Of the twelve new claims alleged in the Amended Petition, only one related to (a) or (b) and even arguably is tied to the same common core of operative facts as (a) or (b). In Ground 11 of his proposed Amended Petition, petitioner claims that the prosecution's introduction of bad character evidence during its case in chief constituted evidentiary error. Based on its comparison of the facts stated in support of Ground 11 of the proposed Amended Petition to the facts stated in support of the fourth ground for relief alleged in the original Petition, the Court finds that the *Mayle* standard for relation back is met with respect to Ground 11 of the Amended Petition.

■ In his Post–Hearing Brief, petitioner does not even make a relation back argument with respect to Grounds 10 and 20–21 of the proposed Amended Petition. However, petitioner does contend that the new ineffective assistance of trial counsel claims alleged as Grounds 12 and 14–18 of the proposed Amended Petition relate to a common core of operative facts presented in Grounds 1 and 2 of his original Petition, namely trial counsel's failure to effectively investigate this case. (*See* Pet. PH Brief at 9–10.) The fallacy of this contention is that every instance of ineffective assistance of trial counsel, no matter at what stage of the proceedings or what particular actions of counsel it relates to, could be characterized as relating to trial counsel's failure to effectively investigate the case. Moreover, petitioner's argument that "[i]n-

effective assistance of counsel should be viewed as a single claim or ground with each allegation of ineffectiveness falling under the single claim" flies in the face of case authority from other Circuits and unpublished Ninth Circuit authority holding that, under *Mayle's* same "time and type" standard, "[n]ew claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision." *See, e.g., United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir.2009), *cert. denied*, 562 U.S. 900, 131 S.Ct. 231, 178 L.Ed.2d 153 (2010); *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir.), *cert. denied*, 547 U.S. 1172, 126 S.Ct. 2341, 164 L.Ed.2d 856 (2006); *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir.2005)[8], *cert. denied*, 547 U.S. 1217, 126 S.Ct. 2906, 165 L.Ed.2d 936 (2006); *see also United States v. Marulanda*, 226 Fed. Appx. 709, 711 (9th Cir.2007) (claim that trial counsel rendered ineffective assistance by referring to the defendant's previous trial on the same charge did not relate back to claims that trial counsel rendered ineffective assistance of counsel by insulting the judge, failing to object to the jury selection process, failing to inform the defendant of his right to testify, and failing to object to the prosecution's use of word "Columbian" at trial).

■ Here, petitioner's initial ineffective assistance of counsel claim arose out of trial counsel's alleged failure to investigate and present evidence that Renteria's identification was not credible. The new ineffective assistance of counsel claims alleged in the proposed Amended Petition

---

**8.** As the Ninth Circuit noted in citing *Ciampi* with approval in *Hebner*, 543 F.3d at 1138, the First Circuit held there that a *pro se* petitioner's ineffective assistance of counsel claim based upon his counsel's failure to inform him of his appeal rights before the plea

did not relate back to his initial claim alleging a due process violation based on the court's failure to advise him of the same consequences because the claims did not arise from the same core fact.

arise out of completely different operative facts: trial counsel's alleged failure to investigate and assert a crucial or potentially meritorious alibi and/or mistaken identity defense relating to the time petitioner arrived at the video store (Ground 12); trial counsel's failure to object to the prosecutor's allegedly false and/or misleading statements during closing argument regarding when and how long petitioner was inside the video store (Ground 14); trial counsel's failure to file a *Pitchess* motion, and failure to seek and use information bearing on the credibility of the police officer witnesses and prosecution witnesses Robles and Lopez (Ground 15); trial counsel's failure to secure the services of a psychologist to testify regarding the psychological factors that affect the accuracy of eyewitness identifications (Ground 16); trial counsel's failure to put on demonstrative evidence and/or failure to make a motion for the jury to be taken to the scene and placed under the same identifying circumstances as the prosecution's witnesses (Ground 17); and trial counsel's failure to investigate adequately the legal and factual grounds for making a motion to exclude Lopez's in-court identification of petitioner (Ground 18). The Court finds that none of these other new ineffective assistance of counsel claims even arguably is tied to the same common core of operative facts as either the first and second, or the remaining grounds for relief alleged in the original Petition.

In his Post–Hearing Brief, petitioner additionally contends that Grounds 12, 15, 18, and 20–21 of the proposed Amended Petition also relate back to Grounds 1 and 2 of his original Petition "through Detective Steven Katz," because "[i]t is Detective Katz who was the lead investigator on this case and presented to the prosecutor the four eyewitnesses, including Maria Renteria," and who "knew or should have known that her identification was fabricated."

(*See* Pet. PH Brief at 10.) As respondent points out, the fallacy of this contention is that nearly every issue in a case would relate back to nearly every other issue since the investigating officer is often involved in most evidence presented at trial. Further, petitioner has failed to cite any legal precedent supportive of this relation-back theory.

Accordingly, the Court finds that, under *Mayle's* same "time and type" standard, the only new claims alleged in the proposed Amended Petition that relate back to the grounds for relief alleged in the original Petition are Grounds 11 and 19.

**B.** *The unrelated claims alleged in the Amended Petition are time barred.*

28 U.S.C. § 2244(d)(1) provides:

"A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-

(A) the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

1. *Unless a basis for tolling the statute existed, petitioner's last day to file a federal habeas petition containing his unrelated claims was June 30, 2010.*

Here, petitioner's judgment of conviction became final on June 30, 2009, when the 90–day period expired for petitioner to petition the United States Supreme Court for a writ of certiorari from the denial of his Petition for Review. *See Bowen v. Roe,* 188 F.3d 1157, 1158–59 (9th Cir.1999); *Calderon v. United States District Court for the Central District of California (Beeler),* 128 F.3d 1283, 1286 n. 2 (9th Cir.1997), *cert. denied,* 522 U.S. 1099, 118 S.Ct. 899, 139 L.Ed.2d 884 and 523 U.S. 1061, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998).[9]

▆▆▆ In his original Reply to respondent's opposition to his Motion to Amend, petitioner did not contend that he was impeded from filing his federal petition by unconstitutional state action and thereby entitled to a later trigger date under § 2244(d)(1)(B). Nor did petitioner contend, with respect to any of his unrelated claims, that he was entitled to a later trigger date under § 2244(d)(1)(C) because his claim is based on a federal constitutional right that was initially recognized by the United States Supreme Court subsequent to the date his conviction became final and that has been made retroactively applicable to cases on collateral review. To the extent that petitioner's contention that he had been conducting an "ongoing investigation" of the facts and the law (*see* Reply at 6–11) was intended as an argument that

petitioner was entitled to a later trigger date under § 2244(d)(1)(D), the Court notes that the statute of limitations begins to run when a prisoner "knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance." *See Hasan v. Galaza,* 254 F.3d 1150, 1154 n. 3 (9th Cir. 2001). Thus, with respect to the unrelated claims alleged in petitioner's proposed Amended Petition (i.e., Grounds 10, 12–18, and 20–21), the Court finds that petitioner either was aware or through diligence could have been aware of the facts underlying all of those claims as of June 30, 2009, when his judgment of conviction became final. For example, as of the time of trial, petitioner was aware that the trial court had failed to bifurcate the proceedings; and that his counsel had failed to file a *Pitchess* motion, failed to secure the services of an eyewitness identification expert, failed to put on demonstrative evidence or move for the jury to be taken to the crime scene, and failed to make a motion to exclude Lopez's in-court identification. Moreover, by June 30, 2009, when the judgment of conviction became final, trial counsel already had turned over to petitioner all of his files and records, and sent to petitioner copies of the Blockbuster tapes showing the time petitioner arrived at the video store. (*See* Reply at 6, 9–10.)

Accordingly, the Court finds that, unless a basis for tolling the statute existed, petitioner's last day to file a federal habeas petition containing his unrelated claims was June 30, 2010. *See Patterson v. Stewart,* 251 F.3d 1243, 1246 (9th Cir.2001); *Beeler,* 128 F.3d at 1287–88.

▆▆▆ The burden of demonstrating that the AEDPA's one-year limitation period

---

9. *Beeler* was overruled on other grounds in *Calderon v. United States District Court (Kelly),* 163 F.3d 530, 540 (9th Cir.1998) (*en*

banc ), *cert. denied,* 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999).

was sufficiently tolled, whether statutorily or equitably, rests with the petitioner. *See, e.g., Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); *Gaston v. Palmer,* 417 F.3d 1030, 1034 (9th Cir.2005) (as amended); *Smith,* 297 F.3d at 814; *Miranda v. Castro,* 292 F.3d 1063, 1065 (9th Cir.2002). For the reasons discussed hereafter, the Court finds and concludes that, with respect to his unrelated claims, petitioner has not met his burden.

2. *Petitioner has not met his burden of demonstrating that statutory tolling rendered the lodging for filing of the Amended Petition herein timely.*

28 U.S.C. § 2244(d)(2) provides:

"The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

In *Nino v. Galaza,* 183 F.3d 1003 (9th Cir.1999), *cert. denied,* 529 U.S. 1104, 120 S.Ct. 1846, 146 L.Ed.2d 787 (2000), the Ninth Circuit construed the foregoing statutory tolling provision with reference to California's post-conviction procedures. The Ninth Circuit held that "the AEDPA statute of limitations is tolled for 'all of the time during which a state prisoner is attempting, through proper use of state court procedures, to exhaust state court remedies with regard to a particular post-conviction application.'" *See id.* at 1006.

In *Carey v. Saffold,* 536 U.S. 214, 219–21, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002), the Supreme Court held that, for purposes of statutory tolling, a California petitioner's application for collateral review remains "pending" during the intervals between the time a lower state court denies the application and the time the petitioner files a further petition in a higher state court. However, such interval or "gap" tolling is unavailable if the petitioner unreasonably delays in seeking higher court review after a lower court petition is denied. *See id.* at 225–26, 122 S.Ct. 2134.

 Here, petitioner is not entitled to any statutory tolling for his first round of state habeas petitions commencing with the filing of his Court of Appeal habeas petition during the pendency of his direct appeal because that round of collateral review was concluded prior to the commencement of the limitation period when, on April 1, 2009, the California Supreme Court denied the Petition for Review from the Court of Appeal's denial order.

Further, petitioner is not entitled to any statutory tolling for the interval preceding the filing of either of his 2010 California Supreme Court habeas petitions. *See King v. Roe,* 340 F.3d 821, 823 (9th Cir. 2003) (holding that when a petitioner files two rounds of state petitions, and either the second round of petitions are denied as untimely, or the second round of petitions are not limited to an elaboration of the facts relating to the claims raised in the first round of petitions, the gap between the two rounds is not tolled under any circumstance); *Dils v. Small,* 260 F.3d 984, 986 (9th Cir.2001) (no interval tolling accorded for interval between successive California Supreme Court habeas petitions); *see also, e.g., Gaston,* 417 F.3d at 1043 ("a California habeas applicant is not entitled to interval tolling if he abandons all of his claims in his first state habeas application and his second state habeas application sets forth new and different claims").

The Court also finds that petitioner is not entitled to any statutory tolling for the pendency of his California Supreme Court habeas petition directed to the trial court's

denial of his motion for post-conviction discovery since that petition did not challenge the legality of petitioner's conviction or sentence. Rather, it merely sought an order to provide discovery that petitioner maintained he would need in order to prepare a subsequent collateral challenge of his conviction. That first 2010 habeas petition therefore did not qualify as a post-conviction application for collateral review within the meaning of 28 U.S.C. § 2244(d)(2). *See Ramirez v. Yates,* 571 F.3d 993, 999–1000 (9th Cir.2009) (holding that petitioner not entitled to statutory tolling for discovery motions that did not challenge the conviction, but simply sought material the petitioner claimed might be of help in later state proceedings).

Respondent contends that petitioner is not entitled to statutory tolling for either of his 2010 California Supreme Court habeas petitions because both were denied with citations to *In re Clark,* which according to respondent signified that they were being denied as untimely and therefore did not qualify as having been "properly filed" within the meaning of § 2244(d)(2). (*See* Opp. at 6–7; Resp. PH Brief at 22–24.) In *Pace,* 544 U.S. at 417, 125 S.Ct. 1807, the Supreme Court held that "time limits, no matter their form, are 'filing' conditions," and that "[b]ecause the state court rejected petitioner's [state] petition as untimely, it was not 'properly filed,' and he is not entitled to statutory tolling under § 2244(d)(2)." *See also Bonner v. Carey,* 425 F.3d 1145, 1149 (9th Cir.2005) ("Under *Pace,* if a state court denies a petition as untimely, none of the time before or during the court's consideration of that petition is statutorily tolled.").

Petitioner maintains that the California Supreme Court's citations to *In re Clark* without a pinpoint citation in its denial orders was "ambiguous" and insufficient to signify that the petitions were being denied for untimeliness since *In re Clark* also stands for other propositions. (*See* Reply at 23–24; *see also* Pet. PH Brief at 33.) Petitioner is mistaken. As the Ninth Circuit has recognized in several cases, the California Supreme Court's citation to *In re Clark* without a pinpoint citation signifies that the petition is being denied for untimeliness. *See Lakey v. Hickman,* 633 F.3d 782, 786 (9th Cir.) (holding that statutory tolling unavailable because, in denying the petitioner's final state habeas petition, "the California Supreme Court cited its decision of *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (Cal.1993), which dealt specifically with the bar of untimeliness" (internal quotation marks omitted)), *cert. denied,* 564 U.S. 1026, 131 S.Ct. 3039, 180 L.Ed.2d 858 (2011); *Park v. California,* 202 F.3d 1146, 1152 n. 3 (9th Cir.2000) (noting that *In re Clark* "dealt specifically with the bar of untimeliness"); *see also Alvarez v. Wong,* 425 Fed.Appx. 652, 652–53 (9th Cir.) (noting that California Supreme Court's citation to *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993) "signals the court's conclusion that the petition was untimely"), *cert. denied,* 565 U.S. 884, 132 S.Ct. 255, 181 L.Ed.2d 148 (2011); *Wafer v. Adams,* 329 Fed.Appx. 83, 84 (9th Cir.2009) (petitioner not entitled to statutory tolling because the California Supreme Court's citation to *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993) "reflected the intention to dismiss [his] second and third state habeas petitions as untimely").[10]

---

**10.** In his Reply, petitioner cited the district court decision in *Ratliff v. Hedgepeth,* 712 F.Supp.2d 1038 (C.D.Cal.2010) for the proposition that the California Supreme Court's citation of *In re Clark* without a pinpoint citation is insufficient to signify that the petition was being denied as untimely. (*See* Reply at 23–24.) However, the Court is unable

Accordingly, the Court concurs with respondent that petitioner is not entitled to any statutory tolling of the limitation period.

3. *Petitioner has not met his burden of demonstrating entitlement to sufficient equitable tolling to render the filing of the original Petition herein timely.*

██ The Supreme Court has held that the AEDPA's one-year limitation period also is subject to equitable tolling in appropriate cases. *See Holland v. Florida,* 560 U.S. 631, 649, 130 S.Ct. 2549, 2562, 177 L.Ed.2d 130 (2010). However, in order to be entitled to equitable tolling, the petitioner must show both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented his timely filing. *See Holland,* 130 S.Ct. at 2562 (quoting *Pace,* 544 U.S. at 418, 125 S.Ct. 1807). The Ninth Circuit has held that the *Pace* standard is consistent with the Ninth Circuit's "sparing application of the doctrine of equitable tolling." *See Waldron–Ramsey v. Pacholke,* 556 F.3d 1008, 1011 (9th Cir.), *cert. denied,* 558 U.S. 897, 130 S.Ct. 244, 175 L.Ed.2d 167 (2009). Under Ninth Circuit authority, "[t]he petitioner must show that 'the extraordinary circumstances were the cause of his untimeliness and that the extraordinary circumstances made it impossible to file a petition on time.'" *See Porter,* 620 F.3d at 959; *Ramirez,* 571 F.3d at 997. "[T]he threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule." *Miranda,* 292 F.3d at 1066. Thus,

as the Ninth Circuit has recognized, equitable tolling will be justified in few cases. *See Spitsyn v. Moore,* 345 F.3d 796, 799 (9th Cir.2003); *see also Waldron–Ramsey,* 556 F.3d at 1011 ("To apply the doctrine in 'extraordinary circumstances' necessarily suggests the doctrine's rarity, and the requirement that extraordinary circumstances 'stood in his way' suggests that an external force must cause the untimeliness, rather than, as we have said, merely 'oversight, miscalculation or negligence on [the petitioner's] part, all of which would preclude the application of equitable tolling.'").

██ Petitioner's contention in his Reply to the effect that he has been diligent in conducting his "ongoing investigation," even if credited, only goes to the first of the two requisite showings for equitable tolling. Petitioner still must show that some extraordinary circumstance stood in his way and prevented his timely filing. The lack of the post-conviction discovery sought by petitioner from the state courts did not stand in his way. Even without such discovery, petitioner was able to prepare and file his 2010 state habeas petitions raising his unrelated claims. Nor does the fact that petitioner is "unversed in the law and the methods of legal research" (*see* Reply at 11) entitle him to any equitable tolling. *See, e.g., Rasberry v. Garcia,* 448 F.3d 1150, 1154 (9th Cir.2006) (holding that "a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling" of the AEDPA limitations period); *Gazzeny v. Yates,* 2009 WL

to reconcile the distinction drawn by the district court in *Ratliff* between untimely and successive state habeas petitions, with only the former not qualifying as being "properly filed" for purposes of statutory tolling (*see Ratliff,* 712 F.Supp.2d at 1050–51), with the Ninth Circuit's statement in *Porter v. Ollison,* 620 F.3d 952, 958 (9th Cir.2010), which post-

dated *Ratliff,* that "[f]or tolling to be applied based on a second round, the petition cannot be untimely or an improper successive petition." Because *Porter* also post-dated the other district court case cited by petitioner in his Reply for the same proposition, *Gipson v. Schwartz,* 2007 WL 1411607 (N.D.Cal. May 11, 2007), the Court declines to follow either.

294199, *6 (C.D.Cal. Feb. 4, 2009) (noting that "[a] prisoner's illiteracy or ignorance of the law do not constitute extraordinary circumstances" for purposes of tolling of the AEDPA statute of limitations); *Eken-berg v. Lewis*, 1999 WL 13720, *2 (N.D.Cal. Jan. 12, 1999) ("Ignorance of the law and lack of legal assistance do not constitute such extraordinary circumstances."); *Bolds v. Newland*, 1997 WL 732529, *2 (N.D.Cal. Nov. 12, 1997) ("Ignorance of the law and lack of legal assistance do not constitute such extraordinary circumstances."); *see also Hinton v. Pacific Enterprises*, 5 F.3d 391, 396–97 (9th Cir.1993) (mere ignorance of the law generally is an insufficient basis to equitably toll the running of an applicable statute of limitations), *cert. denied*, 511 U.S. 1083, 114 S.Ct. 1833, 128 L.Ed.2d 462 (1994); *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir.1991) (holding that neither "lack of knowledge of applicable filing deadlines," nor "unfamiliarity with the legal process," nor "lack of representation during the applicable filing period," nor "illiteracy," provides a basis for equitable tolling).

In his Post–Hearing Brief, petitioner contends the "misdeeds" of his state habeas ("PCR") counsel was sufficiently egregious to warrant equitable tolling of the limitation period under the extraordinary circumstances standard. In this regard, petitioner contends that, "[o]ver a course of many years, PCR counsel: discounted [petitioner's] repeated requests for assistance with obtaining surveillance video from the Blockbuster parking structure ... ignored [petitioner's] request to secure the exculpatory Blockbuster Video that was in the record and being held by the superior court; failed to research the applicable law; recklessly advised [petitioner] about the AEDPA statute of limitations; and failed to include a potentially meritorious argument in her appellate and habeas briefs, namely that [petitioner] could not have committed the crime and walked into Blockbuster at approximately 9:17 p.m." (*See generally* Pet. PH Brief at 20–29; *see also* Pet. PH Reply Brief at 4.)

The law is well established that, while egregious attorney misconduct can qualify as an "extraordinary circumstance" that can warrant equitable tolling, a "garden variety claim" of attorney negligence does not warrant equitable tolling. *See, e.g., Holland*, 130 S.Ct. at 2563–64 (noting that "a garden variety claim of excusable neglect," such as a simple "miscalculation" that leads a lawyer to miss a filing deadline, does not warrant equitable tolling); *Doe v. Busby*, 661 F.3d 1001, 1011 (9th Cir.2011) ("Equitable tolling may be warranted in instances of unprofessional attorney behavior; however, the AEDPA deadline will not be tolled for a garden variety claim of excusable attorney neglect."); *Velasquez v. Kirkland*, 639 F.3d 964, 969 (9th Cir.2011) (for equitable tolling, a habeas petitioner "must have been delayed by circumstances 'beyond [his] direct control,' and not by his or his counsel's 'own mistake' "); *Spitsyn*, 345 F.3d at 800 ("We have not applied equitable tolling in non-capital cases where attorney negligence has caused the filing of a petition to be untimely.").

For example, in *Holland*, the Supreme Court held that the facts before the court, which required further development on remand, were sufficient to "suggest" far more than "garden variety" negligence or "excusable neglect." There, the attorney had failed to file the petitioner's federal petition on time despite the petitioner's many letters that repeatedly emphasized the importance of his doing so. The attorney apparently did not do the research necessary to find out the proper filing date, despite the petitioner's letters that

went so far as to identify the applicable legal rules. The attorney failed to inform the petitioner in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite the petitioner's many pleas for that information. And, the attorney failed to communicate with his client over a period of years, despite various pleas from the petitioner that the attorney respond to his letters. The Supreme Court also indicated the extraordinary nature of the attorney's conduct was supported by the fact that the attorney's conduct violated fundamental canons of professional responsibility. *See Holland,* 130 S.Ct. at 2564.

In *Spitsyn,* the attorney was retained to file petitioner's federal habeas petition a full year in advance of the deadline, but completely failed to prepare or file a petition even though the attorney was contacted numerous times by both the petitioner and his mother seeking action, and a grievance was filed with the state bar association complaining about the lack of response. Also, despite a letter terminating the representation and requesting the return of the file, the attorney retained the file for the duration of the limitation period and more than two months beyond. The Ninth Circuit held that this conduct was sufficiently egregious to justify equitable tolling, although it remanded for further consideration of the issue of petitioner's diligence. *See Spitsyn,* 345 F.3d at 798, 801–02.

In *Doe,* the petitioner hired his former counsel to file a federal habeas petition more than one year prior to the AEDPA deadline, and paid him a $20,000 advance for this service. The petitioner provided the attorney with his files and repeatedly made inquiries on the progress of his case. Not only did the attorney not file a timely habeas petition, he filed no petition at all, in spite of his numerous promises to the contrary. When the petitioner eventually sought his files from the attorney, the attorney took six months to return them. The Ninth Circuit found that these circumstances were far more egregious than those encountered in *Spitsyn. See Doe,* 661 F.3d at 1012.

Here, by way of contrast to *Holland, Spitsyn,* and *Doe,* and to the other cases cited by petitioner, petitioner was not relying on his PCR counsel to file a timely federal habeas petition. Moreover, all of PCR counsel's alleged misdeeds relating to the Blockbuster video about which petitioner is complaining predated the commencement of the limitation period on June 9, 2009. As of that date, petitioner had had in his possession for several months all of the files and records he had requested from his PCR counsel; petitioner also had had in his possession since April 20, 2009 the report from his video expert upon which his so-called alibi defense was predicated. (*See* Exh. B to Pet. PH Reply Brief.) Therefore, none of PCR counsel's alleged misdeeds relating to the Blockbuster video was the cause of the untimeliness of the proposed Amended Petition.

Further, the Court disagrees with petitioner that he is entitled to equitable tolling because his PCR counsel provided him with "grossly reckless advice concerning exhaustion and the AEDPA statute of limitations." It was not a misstatement of the law for PCR counsel to advise petitioner repeatedly that any claims he raised in his federal habeas petition had to be first exhausted in the state courts. Moreover, contrary to petitioner's characterization (*see* Pet. PH Brief at 26), PCR counsel never advised petitioner that, in order to exhaust his state remedies, "he must exhaust his claims in the state courts by filing habeas petitions in all three: the superior court, Court of Appeal, **and** Cali-

fornia Supreme Court." Review of the December 30, 2008 and February 12, 2009 letters from PCR counsel, which the Court ordered be lodged under seal, reveals that in both letters, PCR counsel merely advised petitioner that state habeas petitions normally are filed first in the superior court and then in the Court of Appeal if superior court petition is denied, and that if denied by the Court of Appeal, petitioner could seek California Supreme Court review of that denial. That was not a misstatement of the law. Indeed, in *Saffold*, 536 U.S. at 221–22, 122 S.Ct. 2134, the Supreme Court observed that "California's 'original writ' system ... is not as special in practice as its terminology might suggest"; that, "[a]s interpreted by the courts, California's habeas rules lead a prisoner ordinarily to file a petition in a lower court first"; and that "typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court."

The Court also disagrees with petitioner that it was egregious for PCR counsel to neglect to inform petitioner that the AEDPA limitations period is tolled only during the pendency of properly filed state petitions. Even assuming arguendo that PCR counsel should have advised petitioner of something so self-evident, the failure to do so at most amounted to negligence, not egregious misconduct. *See Souliotes v. Evans*, 622 F.3d 1173, 1175 (9th Cir.2010) ("We affirm the denial of equitable tolling because the failure of Souliotes's attorney to note the correct date on which Souliotes's state court decision became final is not an 'extraordinary circumstance,' but rather an instance of ordinary negligence."), *vacated on other grounds*, 654 F.3d 902 (9th Cir.2011); *Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir.2001) ("We conclude that the miscalculation of the limitations period by Frye's counsel and his negligence in general do not constitute ex-

traordinary circumstances sufficient to warrant equitable tolling.").

Finally, the Court notes that, in her January 30, 2009 letter, PCR counsel advised petitioner that what he could do to preserve for federal review his ineffective assistance claim corresponding to Ground 12 of the proposed Amended Petition and toll the AEDPA deadline was "file a petition for writ of habeas corpus in the California Supreme Court as soon as possible and assert ineffective assistance of trial counsel for failing to adequately investigate the Blockbuster surveillance tapes." In her ensuing February 12, 2009 letter, PCR counsel urged petitioner to "start the process as soon as possible, so that you can complete [the state habeas] litigation within one year while you are working on your federal petition." Petitioner did not follow this advice. Instead, petitioner delayed filing a California Supreme Court habeas containing an ineffective assistance claim for failing to adequately investigate the Blockbuster surveillance tapes until March 25, 2010, over thirteen months later. The California Supreme Court's denial of that petition for untimeliness was not attributable to incorrect advice received from PCR counsel, but rather to petitioner's failure to follow his PCR counsel's advice.

The Court therefore finds that petitioner is not entitled to any equitable tolling of the limitation period.

### C. *Petitioner has not made a sufficient showing for application of the "actual innocence" exception to the AEDPA statute of limitations.*

In *McQuiggin v. Perkins*, —— U.S. ——, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013), the Supreme Court held that a "convincing showing" of actual

innocence under *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), can overcome the AEDPA statute of limitations. Thus, the question becomes whether petitioner has made such a "convincing showing." If not, granting his Motion to Amend with respect to Grounds 10, 12–18, and 20–21 of the proposed Amended Petition would be futile.

1. *The "actual innocence" standard*

In *Schlup*, the Supreme Court held that, for the "fundamental miscarriage of justice" exception to apply, the petitioner must show that a constitutional violation probably has caused the conviction of one who is actually innocent of the crime. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851. Under *Schlup*, petitioner must establish his factual innocence of the crime, and not mere legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *Jaramillo v. Stewart*, 340 F.3d 877, 882–83 (9th Cir.2003). The Supreme Court further held in *Schlup* that, "[t]o be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851. Further, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327, 115 S.Ct. 851.

The Supreme Court has stressed that the exception is limited to "certain exceptional cases involving a compelling claim of actual innocence." *House v. Bell*, 547 U.S. 518, 521, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006); *see also McQuiggin*, 133 S.Ct. at 1928 ("tenable actual-innocence gateway pleas are rare"); *Schlup*, 513 U.S.

at 324, 115 S.Ct. 851 (noting that "experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare"). Moreover, the Ninth Circuit has noted that, because of "the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected." *Shumway v. Payne*, 223 F.3d 982, 990 (9th Cir.2000) (*citing Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)).

In reviewing a *Schlup* actual innocence claim, the Court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 331–32, 115 S.Ct. 851. As explained by the Supreme Court in *Schlup*, this is a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329, 115 S.Ct. 851. The "new evidence" need not be newly available, just newly presented—i.e., evidence that was not presented at trial. *See Griffin v. Johnson*, 350 F.3d 956, 962–63 (9th Cir.2003), *cert. denied*, 541 U.S. 998, 124 S.Ct. 2039, 158 L.Ed.2d 510 (2004). Further, "[i]n assessing the adequacy of petitioner's showing, ... the district court is not bound by the rules of admissibility that would govern at trial." *See Schlup*, 513 U.S. at 327, 115 S.Ct. 851; *see also House*, 547 U.S. at 537–38, 126 S.Ct. 2064 ("the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial" (internal quotation marks omitted)). Accordingly, as described by Judge Kozinski in his dissenting opinion in *Carriger v. Stewart*, 132 F.3d 463, 485–86 (9th Cir. 1997) (en banc), *cert. denied*, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998), in evaluating a claim of actual inno-

cence, a habeas court is required to posit a hypothetical jury that is entitled to consider both admissible and inadmissible evidence, so long as the inadmissible evidence is reliable.

### 2. *Evidence presented at trial*

Since petitioner's actual innocence claim requires consideration of the evidence presented at his trial, the Court has independently reviewed the state court record. The following is a summary of the evidence presented at trial, which the jury found sufficient to prove beyond a reasonable doubt that petitioner was guilty of the first degree murder of Jose Robles.

#### a. The murder

On the evening of May 10, 2003, Jose "Chino" Robles and his family were hosting a barbecue in their backyard on 101st Street in Los Angeles. Shortly before 9:00 p.m., Chino, who was a member of a tagging crew known as "No Control" or "NC," began to walk to a nearby liquor store. (2 RT 937, 948; 3 RT 1539, 1630, 1848.) While still on 101st Street, he met another member of NC, Albert Segundo, who was heading to the barbecue at the Robleses' home. (3 RT 1535–36.) Segundo had just seen petitioner, the leader of rival tagging crew "NGA," who was known as "Illusion," accompanied by another rival gang member known as "Drips." Petitioner was driving in a white van with wood paneling.[11] (3 RT 1536–41, 1557; 4 RT 1883, 2109.) Segundo testified that he flashed an "NC" sign at petitioner and Drips as they drove by. (3 RT 1556.) Sensing that there might be trouble, Segundo warned another friend to take some young women who were standing in the street back into the Robleses' home. Segundo also warned Chino that the liquor store where he was heading was in "enemy

territory," but Chino shrugged off the warning, replying that he would be fine because he had his knife. (3 RT 1539.)

Segundo walked across the street from the Robleses' home to pick up a friend, and, seconds later, heard two gunshots. Segundo turned and saw Chino holding onto a fence rail as Drips fired about 13 more shots at Chino. (3 RT 1539, 1542–43, 1549.) Segundo watched as Drips reentered the white van through the passenger door. As the white van drove past the Robleses' home, Segundo and his friend, Andres Sandoval, jumped into a car and gave chase. At a stop sign a couple of streets away at the intersection of 102nd and Hoover, Drips got out of the van and pointed a semiautomatic gun at Sandoval's car. Sandoval turned the car around and returned to the Robleses' home. (3 RT 1544–49, 1567, 1570–72; 4 RT 1840, 1845–47, 1858–59.)

Two of the Robles brothers, Adrian and Anthony, were across the street from Chino during the shooting. Adrian, who was 14 at the time, saw the driver of the white van with wood paneling. He could only see that the driver had dark skin. (3 RT 1255–57, 1271.) Anthony also described a white van with wood paneling. He did not see the driver. (3 RT 1274–78, 1284.) Both brothers testified that their brother Jesse told them shortly after the shooting that he had seen the driver of the van, and he identified the driver as petitioner. (3 RT 1260, 1278.)

The shooting was reported at 8:58 p.m. (4 RT 1892.) Eleven cartridge casings and six bullets or bullet fragments were recovered from the scene, all of which were fired from the same gun. According to a firearms expert, the gun that fired the casings and bullets was a .9 mm semi-

---

11. At trial, a Los Angeles County Sheriff's deputy testified that there was no evidence that the white van belonged to petitioner. (3 RT 1516.)

automatic Luger. (3 RT 1291–92, 1517–18; 4 RT 181519, 1822.)

### b. The identification of petitioner

At trial, four witnesses identified petitioner as the driver of the white van: Segundo, who attended high school with petitioner; Chino's younger brother, Jesse Robles, who ran to the street when he heard shots and saw the van speed away; Jesse's friend, Carlos Lopez, who also ran to the street when shots were fired and was standing next to Jesse when the van drove by; and Maria Renteria, who lived in a rental unit behind the Robleses' house and was parking her own van nearby when the shooting began.

### (1) Albert Segundo

Segundo testified that he recognized petitioner when the white van passed him prior to the shooting and then again when the shooter, Drips, opened the door to point a gun at him and Sandoval after the shooting. (3 RT 1536–38, 1549.) Segundo explained that the van's interior was illuminated when Drips opened the door. According to Segundo, petitioner had a bald head, was wearing a black t-shirt, and had a steel bar piercing through his left eyebrow. (3 RT 1546, 1549, 1563, 1575.) [12] Segundo testified he had seen petitioner "hundreds of times," and he was "absolutely certain" that petitioner was the driver of the white van. Segundo testified that he could see "half of his face real clearly." (3 RT 1543, 1550, 1554, 1572, 1574–75.) Petitioner's counsel sought to impeach Segundo by eliciting testimony that Segundo had initially blamed two local Hispanic gang members for the shooting in an interview with Los Angeles County Sheriff's depu-

ties. Segundo admitted the he had lied to the deputies at first, but he claimed that he had been afraid of retaliation from petitioner and his crew. He also testified that he was afraid to testify at the time of trial.[13] (3 RT 1536, 1543–44, 1547, 1553–55, 1558–60; 4 RT 2143–44.)

### (2) Jesse Robles

Jesse Robles was at the barbecue in his family's backyard when he heard two or three shots fired and raced toward the street. As he ran, he heard another 13 shots. The shooting had ended by the time he reached the gate of the driveway. He was soon joined by his friend, Carlos Lopez. Jesse, who estimated that he had seen petitioner more than 50 times in the neighborhood, recognized petitioner as the driver when the white van drove by the driveway. Jesse testified that he could see inside of the white van because there was a light pole across the street from his house and also because the lights from Maria Renteria's van shone into the white van as it passed the Robleses' house. He had a good look at the face of the driver. As Jesse and Lopez stood there, they acknowledged to each other that petitioner was the driver. Jesse was certain the driver was petitioner even though petitioner usually drove a green Camry. Jesse told Lopez that he recognized petitioner the night of the shooting, and he also told two of his brothers that he recognized petitioner. He then told Detective Katz that he had recognized petitioner as the driver of the van the first time that an in-depth interview was conducted about two days after the shooting. Jesse provided Detective Katz with petitioner's name,

---

12. A Sheriff's deputy testified that he had come into contact with petitioner on April 5, 2003, about one month prior to the shooting. At that time, petitioner had a piercing with a straight metal bar through his left eyebrow. (3 RT 1528–29.)

13. In order to compel Segundo to testify, the court issued a body warrant authorizing his arrest and detention pending completion of his testimony. (1 CT 112; 5 RT 1578.)

identified a photograph of petitioner, and took the detective to petitioner's house. Jesse, who was a member of the NC tagging crew, also testified that he wanted to avoid testifying at trial and decided to come forward only when his family asked him to do so. (2 RT 937–38, 941–44, 946, 948, 952–53, 962, 968–69, 972, 977, 982–83, 987; 3 RT 1319–21, 1616.)

### (3) Carlos Lopez

Carlos Lopez was in the backyard at the Robles family barbecue when the first shots were fired. He ran after Jesse Robles toward the street, arriving in time to see the white van with wood paneling drive past. Lopez knew petitioner as the leader of NGA, and he testified that he had seen him on about four previous occasions. Petitioner had a shaved head and was wearing a black shirt or sweat shirt. Lopez was contacted by sheriff's deputies soon after the shooting and identified petitioner as the driver. (3 RT 1608–09, 1614–17, 1621, 1626.) He was "certain" that petitioner was the driver of the white van. (3 RT 1615–16.)

### (4) Maria Renteria

Renteria had just parked her van on the street in front of the Robleses' home, but she had not yet turned off her headlights when she saw a van, "like a white Dodge Caravan," facing the wrong way on the street in front of her. She could see a "Black male" inside of the white van, who was the driver. (3 RT 1225–26, 1228–29, 1232–34.) Renteria watched as a "Black guy" got out of the white van, and, after the shooting had stopped, get back inside the van. The white van started driving toward her and then drove past her. (3 RT 1229–30, 1235.) The headlights of her van shone inside the white van. (3 RT 1230.) Renteria testified that she had never seen the driver of the white van before that night. When asked by the prosecutor if "the person sitting here at the end of

counsel table" was the "person that [she] saw in the car," Renteria responded that "[i]t looks like him." (3 RT 1226–27, 1229–30.) Renteria agreed that she "had a good view" of the driver when her headlights "hit the other van." (3 RT 1231, 1245.)

### c. Other evidence linking petitioner to the murder

To establish a preexisting relationship between petitioner and Chino's family, the People elicited testimony about three previous incidents. First, Jesse Robles testified that, at some time prior to the shooting, he was in an alley watching a friend tag a wall with the acronym "SAP" and cross out the tag "NGA." Petitioner drove up "in a white Thunderbird" with one of his brothers. Petitioner challenged Jesse and his friend, asking why they were "crossing out" his "hood." Jesse's friend ran, chased by petitioner's brother. Petitioner approached Jesse, took his bicycle and threw it over a gate. (2 RT 947–51.)

Second, Segundo testified that he saw Chino and some others "jump" petitioner between 101st and 102nd Streets a month or two before the shooting. (3 RT 1643–44.)

Third, five witnesses, including Lopez, testified about a series of incidents involving petitioner, petitioner's brother Jeremy, and Chino that occurred earlier on the day of the murder. It began when Chino and some friends were standing in front of Maria Perez's home on 102nd Street at Vermont, one street away from the Robleses' home. Both homes were in NC territory. (3 RT 1618, 1629; 4 RT 1870, 1872–73, 1877.) Jeremy Coleman walked past Chino's group, which was affiliated with NC. Jeremy asked Chino where he was from, meaning to what tagging crew did he belong, but Chino did not answer. Jeremy identified himself as NGA, and Chino laughed at him. Jeremy threatened

to go get his brother. Chino responded, "Fuck NGA." Jeremy said, "Why don't you just say that in my brother's face." Jeremy "ran off" in the direction of a liquor store. (3 RT 1618, 1629–31, 1873–74, 1877.) When Jeremy started to run away, a member of NC chased him and hit him with a baseball bat. (3 RT 1637–38; 4 RT 1875–78, 1881, 1885.) Then, about 30 minutes after the verbal confrontation between Jeremy and Chino, petitioner and Jeremy drove to the Perez' home on 102nd Street in petitioner's green Camry. Chino was no longer there. Petitioner asked Lopez, "Which one of you was trying to fight my brother?" When no one answered, Jeremy asked where Chino was. After he was told that Chino had returned to his house, Jeremy threatened that "he was going to get Chino or anybody from NC." (3 RT 1612–14, 1618, 1620, 1632–34.) During the afternoon incident, petitioner was wearing a black t-shirt. (3 RT 1617, 1620, 1633.)

Petitioner's brother Jeremy, who was 14 at the time of the shooting, testified under a grant of immunity. He testified that he was with Catherine Morales (his then girlfriend) on 102nd Street when Chino approached them. Chino asked Jeremy if he was from NGA, and Jeremy said, "no." Chino then said, "Fuck NGA." Jeremy said, "talk to my brother." (4 RT 2101, 2106–09.) Jeremy walked away toward Vermont, and Chino followed. Jeremy started running, but Chino hit him on the arm with a bat. (4 RT 2110–11.) Jeremy told petitioner about the encounter. They drove back toward the liquor store, but they saw a van with "at least 7 or 8 people." Petitioner then told Jeremy "not to go there no more." (4 RT 2111–12.)

Jeremy also testified that he was with petitioner on 98th Street at the time of the shooting. They stayed there for "a little while longer" after hearing the shots, then petitioner dropped Jeremy at his mother's house. Later, petitioner brought movies back from a Blockbuster store. (4 RT 2113–14, 2116.) However, Detective Katz impeached Jeremy's testimony with Jeremy's prior statement that petitioner had dropped Jeremy off at home earlier in the evening. Jeremy did not tell the detective that he was with petitioner when he heard shots fired that night. Jeremy also told Detective Katz that petitioner came home with movies around 9:00 or 9:30 that night. (4 RT 2120–21, 2124.)

The People also introduced a surveillance videotape from a Blockbuster video store located a five-to-seven-minutes drive from the crime scene. (4 RT 1890.) Detective Katz testified that the videotape was taken on the night of the shooting. He compared his watch to the time indicated on the video system, and testified that the time stamp on the videotape was 6 minutes slow, or "behind what the real time was," in comparison with his watch. (4 RT 1890; 5RT 2440–41, 2468–69.) Detective Katz testified that the videotape indicated that petitioner was checking out at 9:40 p.m., and the register receipt indicated that petitioner checked out with three movies at 9:38 p.m. The detective did not compare the time on the register to that on his watch. (4 RT 1890, 1892; 5 RT 2438–39, 2441, 2469–70.) In the videotape, petitioner can be seen to be wearing a black t-shirt over a white shirt. (4 RT 1891; 5 RT 2439–40, 2461.) While the videotape showed petitioner checking out, the detective could not see exactly when petitioner had entered the store. The first time that Detective Katz could see petitioner in the videotape was at 9:35 p.m. (4 RT 1892; 5 RT 2461, 2464, 2469.) Detective Katz also testified that he did not recall any camera with a view of the parking lot. (4 RT 1893.)

#### d. Petitioner's defense

Lennin Chavarria testified that he "saw [petitioner] parked in front of his girlfriend's house" on 98th Street the night of the shooting approximately at the time the sun was coming down. Lennin was a member of NGA. (5 RT 2405–06.) Petitioner was sitting inside his green Camry. Lennin also saw petitioner's girlfriend, Evelyn, Evelyn's two brothers, and another friend, Aaron. Lennin testified that he did not remember seeing petitioner's brother Jeremy at 98th Street that night. The group was talking when they heard some gun shots. Lennin drove off in his car to check out where the shots may have come from. He did not see petitioner leave the location. (5 RT 2406–09, 2412.) Lennin drove around the area and checked on some friends. When he returned to 98th Street, he found the same people there in petitioner's Camry. (5 RT 2409–11.) In the People's rebuttal, Detective Valento testified that he interviewed Lennin on April 8, 2004. At that time, Lennin said that he was at 98th Street with petitioner, Evelyn, Aaron Arellano, one of Evelyn's brothers, and two other women. (5 RT 2449–50.) Further, in a conversation that was recorded in a Sheriff's Department van among Lennin, Aaron, and another friend on April 9, 2004, Lennin said he knew where he was during the shooting, but he did not mention knowing where petitioner was. (5 RT 2451–53.)

Petitioner's then girlfriend, Evelyn Medina[14], testified that she was outside her house the night of the shooting with petitioner, her brothers Jesse and David, Aaron, and Lennin. She did not recall Jeremy Coleman being present. Both petitioner and Lennin said that they heard gun shots. Evelyn did not hear any shots. (5 RT 2419–21, 2423.) Petitioner and Lennin left in separate cars. Petitioner was driving his green Camry. Both men came back to 98th Street. She did not see anyone at that location that night with a white van. (5 RT 2420–22.) Evelyn testified that she was sure that petitioner was with her when the others heard gun shots. (5 RT 2422.) Later that evening, she went with petitioner and her two brothers to a Blockbuster store and rented three movies. (5 RT 2425–26.) She was aware that Jeremy had been hit by a bat by a member of NC earlier that day because Jeremy had told her about the incident. She told petitioner. (5 RT 2427–29.)

Detective Katz testified that Lennin and Evelyn both told sheriff's deputies prior to their testimony in court that petitioner was at 98th Street with them at the time that the shots were fired. (5 RT 2434–35.)

3. *Whether the evidence presented at the evidentiary hearing constitutes "new reliable evidence" of petitioner's actual innocence sufficient to satisfy his burden under Schlup*

The gravamen of petitioner's actual innocence claim, as it has been framed throughout these proceedings, is that (a) new forensic analysis of the videotape evidence shows that he was at the Blockbuster video store at 9:25 p.m., and (b) there was not enough time for petitioner to have participated in the shooting, taken the route away from the scene of the shooting to which two witnesses testified at trial, stop at his girlfriend's house to pick her up, and then make it to the Blockbuster video store in time to enter the store as depicted on the videotape.

In his Post–Hearing Brief, petitioner argues that he has presented "new evidence" that shows "that he arrived at Blockbuster at a time so soon after the murder and

14. Evelyn testified at trial that she and petitioner had later married and that they were married at the time of her testimony. (5 RT 2419.)

after having made several stops, that he could not have committed the murder." (Pet. PH Brief at 1, 3.) Petitioner contends that "[n]ew forensic evidence shows that, according to the time stamp on the video" from the Blockbuster store, he "entered the video store at 9:25 p.m." (*Id.* at 1.) Petitioner then argues that, because "the video time stamp is not accurate based on the register receipt, [petitioner] walked into Blockbuster eight minutes earlier, or at 9:17 p.m." (*Id.* at 12.) Further, petitioner contends that the "trial testimony and a new timed driving demonstration show that [he] could not commit the crime and walk into Blockbuster at 9:17 p.m." (*Id.* at 2, 6–7.)

In support of this actual innocence claim, the following evidence was presented at the evidentiary hearing.

### a. Petitioner's "new evidence"

Petitioner's expert testified concerning his forensic analysis of the Blockbuster videotape. The expert digitized the videotape and separated the four camera views into four files, enabling each camera view to be watched separately. He then saved all of his files onto a DVD. (*See* Doc. No. 154 at 8–10.) Based on his analysis of the resulting DVD, the expert concluded that the videotape reflected that petitioner entered the Blockbuster store at 34 seconds past 9:25 p.m. (*Id.* at 14–15, 19.) To reach his conclusion, the expert used the time stamp on the videotape itself. He testified that he was "not opining on the accuracy of time stamp at all." (*Id.* at 16.)

Petitioner also presented the testimony of a defense investigator, Victor Gomez. Gomez conducted a timed driving demonstration of the route petitioner "could have taken," if he had "[c]ommitted the crime, been involved in a pursuit that ended at the intersection of South Hoover and West 102nd Street, traveled to the home of Evelyn Medina to pick her up and also pick up Jeremy Coleman at that location, and then traveled to the home of the Coleman brothers' mother's home [sic] and then enter the Blockbuster." (*Id.* at 21, 23.) Gomez conducted the demonstration on Saturday, October 12, 2013, at 9:10 p.m. (*Id.* at 25–26, 31.) He began his demonstration at the scene of the shooting, traveled to the end of the pursuit,[15] paused for 10 seconds, traveled to Evelyn's home on 98th Street, stopped for 10 seconds, drove to petitioner's mother's house, stopped for approximately 10 seconds, and then drove to the parking lot of the former Blockbuster video store. (*Id.* at 31–36.) According to the video that Gomez prepared of his demonstration, the drive took 15 minutes and 46 seconds. (*Id.* at 36.) According to the stopwatch that Gomez used during the demonstration, the elapsed time was 15 minutes and six seconds. (*Id.*)

### b. Respondent's evidence

Respondent also presented evidence of two timed driving demonstrations. One was conducted on Saturday, August 11, 2012, at 9:00 p.m., and it took "just over nine minutes," but the investigator did not stop at Evelyn's house during the demonstration. (*Id.* at 43, 50–52.)

---

**15.** Gomez testified at the Evidentiary Hearing that, to replicate the pursuit of the white van, he drove eastbound on West 101st Street, turned right at South Vermont Avenue, then turned left at West 104 Street, turned left again at South Baring Cross Street, turned right at West 102nd Street, and finally stopped at the intersection of South Hoover and West 102nd Street. (Doc. No. 154 at 32.)

At trial, Segundo and Sandoval testified that they followed the white van toward Vermont, turned right onto Vermont, then made a left on 104th Street and drove a few blocks to Baring Cross Street. They turned right on 102nd or 103rd Street, and then stopped on Hoover. (3RT 1544, 1567–71; 4 RT 1857–59.)

### c. Analysis of the "new evidence" in light of the record

Putting aside the deficiencies (discussed below) in petitioner's argument, and accepting the longer of the two times for petitioner's timed driving demonstration testified to by petitioner's investigator, the bottom line is that petitioner's timed driving demonstration reflects that petitioner's proposed route that night, including the three stops that he contends that he made before arriving at the Blockbuster store, took slightly less than sixteen minutes. Because the shooting occurred no later than 8:58 p.m. (4 RT 1892), petitioner's own evidence reflects that, even after driving the route of his choice, petitioner would have arrived in the parking lot of the Blockbuster store by 9:14 p.m. Further, even accepting petitioner's assertion that his "new evidence" reflects that he "walked into Blockbuster . . . at 9:17 p.m." (Pet. PH Brief at 2, 6), petitioner's own evidence places him in the parking lot with three minutes to spare. Accordingly, petitioner's own assessment of his "new evidence" altogether fails to show that it would not have been possible for petitioner to have committed the murder and then enter the Blockbuster store as shown on the videotape.

Moreover, petitioner's argument in support of his actual innocence claim—that he "could not commit the crime and walk into Blockbuster at 9:17 p.m."—is based on conjecture and unsubstantiated assumptions. First, petitioner asserts that the "murder occurred at 8:58 or 9 o'clock at night." (Pet. PH Brief at 2 (internal quotation marks omitted).) But in his calculations of the "timing" of events that night,

petitioner begins with the premise that "the murder was at 9:00 p.m." (*Id.* at 1, 6–7.) The trial evidence, however, reflects that the shooting was **reported** to the police at 20:58, or 8:58 p.m. (4 RT 1892.) [16] Petitioner points to no evidence to contradict Detective Katz's trial testimony that the shooting occurred **prior to 8:58 p.m.**

Second, petitioner himself acknowledges that the time stamp on the register receipt can be used to "correct" the time stamp on the videotape only if one "assum[es] that the time on the cash register receipt is accurate." (Pet. PH Brief at 4–5.) [17] The trial record, however, reflects that Detective Katz did not verify the accuracy of the time stamp on the cash register. (4 RT 1890; 5 RT 2441, 2468–69.) Further, petitioner's own forensic expert testified that he was "not opining on the accuracy of the time stamp at all." (Doc. No. 154 at 16.) Petitioner incorrectly asserts that no evidence exists to refute his assumption that the "Blockbuster Video time stamp was eight minutes **fast**." (Pet. PH Brief at 5 (emphasis added).) To the contrary, the only evidence in the record regarding the relative accuracy of the time stamp on either the videotape or the cash register receipt is the trial testimony of Detective Katz. Detective Kata testified that the videotape's time stamp was **six minutes slower** than the time on his watch when he collected the videotape. (4 RT 1890; 5 RT 2468–69.) Because no evidence in the record substantiates the accuracy of the time stamp on the register receipt, petitioner's use of that time stamp to create an eight-minute "correction" to the time stamp on the videotape has no basis in the record. Accordingly, the Court rejects petitioner's

---

16. Petitioner's citation to 1RT 937 (*see* Pet. PH Brief at 2) is merely the prosecutor's approximation of the time of the shooting when questioning the first witness at trial.

17. The Court notes that petitioner first asserts that the "accuracy of the cash register's time stamp could be questioned" (Pet. PH Brief at 4–5), but then assumes that the time on the cash register receipt is accurate. (*Id.* at 5.)

unsupported speculation that the time stamp on the cash register receipt was correct, that an eight-minute difference existed between the time stamps on the videotape and the cash register receipt, and that petitioner entered the Blockbuster store at 9:17 p.m. on the night of the murder.

Third, petitioner's assertion that "the surveillance video of [petitioner] paying for his rentals is time stamped 9:46 p.m.," (Pet. PH Brief at 3 (citing RT 2124, 2439, 2461–62)), misrepresents the record. Further, petitioner is incorrect in stating that the "Blockbuster Video[tape], as it was presented at trial, only showed [petitioner] paying for his video rentals at the cashier, it did not show his arrival at the store." (*Id.* at 3.) Petitioner disregards the rebuttal testimony of Detective Katz. Initially, during the State's case, the prosecutor asked the detective "did you review a videotape of the [Blockbuster store] that indicated that it was at 2140 hours?" The detective agreed and also agreed that "the videotape actually [was] about six minutes behind what the real time was." (4 RT 1890.) Detective Katz then agreed that, "looking at the videotape at that Blockbuster location," he saw petitioner "on that videotape at 21—what would [sic]—2146 hours." (*Id.* at 1890, 1892.) However, when called during the defense case, Detective Katz also agreed with petitioner's counsel that "the videotape had a slightly different time than the register" receipt, and that, according to the videotape, "it was 2146." (5 RT 2439.) During redirect, Detective Katz clarified that, "if the tape is 6 minutes slow, that means that 2140 is really 9:46." (5 RT 2469.) Taking this testimony in context, it is clear that any reference to 2146 in the trial transcript already includes an adjustment to account for the six-minute discrepancy with Detective Katz's watch. Moreover, Detective Katz testified that the time on the video-

tape was six minutes **slower** than his watch. (4 RT 1890; 5 RT 2468–69.) Accordingly, petitioner's calculation that he arrived eight minutes **earlier** than the time stamp on the videotape that his expert identified as the point when petitioner entered the store is contrary to the evidence in the record.

Further, the record reflects that Detective Katz reviewed the videotape at a lunch break during trial and testified in rebuttal that he had been able to identify petitioner on the videotape near the entrance to the Blockbuster store at 2135.51, or approximately 9:35 p.m. (5 RT 2460–61, 2464), although the detective still could not locate the moment that petitioner "came into the store" (5 RT 2462, 2469). Detective Katz also testified that he was able to locate petitioner "at the cash register checking out at 2139" (or 9:39 p.m.), which is nearly the same time as the time reflected on petitioner's receipt. (5 RT 2439 (receipt from the Blockbuster store reflects that petitioner rented his movies at 2138); 2465 (petitioner shown at the cash register at 2139.49).) Detective Katz then played the videotape for the jury, pausing at 2135.51 when he first discerned petitioner on the videotape, and then going frame by frame until petitioner could be seen at the cast register at 2139.49. (5 RT 2464–65.) The portion of Detective Katz's testimony quoted by petitioner in his Post Hearing Brief that petitioner contends proves that Detective Katz "testified that the surveillance video of [petitioner] paying for his rentals is time stamped 9:46 p.m." (Pet. PH Brief at 3), pertains to what Detective Katz described as petitioner's first appearance on the videotape. Prior to the quoted testimony, the prosecutor asked Detective Katz, "Did you try to find the place where the defendant came into the store." In explaining the significance of petitioner's appearance at 2135, the prosecutor de-

scribed the camera locations and then asked, "The first time you saw the defendant, was that on the second camera right by the counter as you go in?" (5 RT 2461–63.) When the videotape was played for the jury, Detective Katz confirmed that "at 2135.51 is where you see the defendant right at the place where this second camera would be after somebody walked in." (5 RT 2464.) Further, Detective Katz confirmed that Camera 3 captured "a view at the cash register [showing petitioner] checking out at 2139.49." (5 RT 2465.) Petitioner did not offer the testimony of his own expert on what the forensic analysis of the videotape revealed regarding the time that petitioner was shown paying for the movies that he rented. Accordingly, the only evidence in the record reflects that the time stamp on the videotape when petitioner is seen checking out is 2139.49.

Fourth, petitioner misrepresents his own evidence presented at the Evidentiary Hearing. Petitioner's investigator testified that the timed driving demonstration that he conducted began at the scene of the murder and included (a) the pursuit that ended at the intersection of South Hoover and 102nd Street, (b) a route from the end of the pursuit to Evelyn's home to pick up Evelyn and Jeremy Coleman, (c) a route from Evelyn's home to the home of the Coleman brothers' mother, and (d) a route from there to the parking lot of the Blockbuster store. (Doc. No. 154 at 21, 23, 31.) During his driving demonstration, the investigator paused for 10 seconds each at the end of the pursuit, at Evelyn's home, and at the Coleman brothers' mother's home. (*Id.* at 3136.) Accordingly, the 15 minutes and 46 seconds of the driving demonstration already accounts for "[d]riving in the opposite direction" from the scene of the murder, confronting the men conducting the pursuit, circling back to pick up Evelyn and Jeremy, and dropping Jeremy off at their mother's house. (Pet. PH Brief at 6–7.) [18] Accordingly, petitioner's contention that, after the approximately 15 minutes to drive to the Blockbuster store, he would have "less than two minutes to confront the witnesses who followed the white van, say goodbye to someone with whom [petitioner] had just committed murder, dump out of sight the getaway vehicle, change clothes, switch into the green Camry,[19] pick up his girlfriend and her adolescent brothers ..., and then finally drop off

---

[18]. The Court notes that petitioner's argument that he "must have dropped Jeremy Coleman off [at their mother's house] after picking up everyone else," is based solely on Jeremy's trial testimony and ignores evidence to the contrary. (Pet. PH Brief at 7 (citing 4 RT 2114, 2116).) The record reflects that Jeremy testified that he and another brother were with petitioner, Evelyn, and her brother, before petitioner dropped Jeremy off at their mother's house after the group heard the shots fired. Jeremy, however, previously told Detective Katz that petitioner had dropped him at home earlier in the evening and did not claim to be with petitioner at the time the shots were fired. (4 RT 2113–14, 2120, 2124.) Further, both Lennin and Evelyn testified that they were with petitioner at the time of the shooting and both testified that they did not recall Jeremy being present. In addition, Detective Valento testified that, when he interviewed Lennin, Lennin did not include Jeremy on the list of those who were with the group that night. (5 RT 2406–07, 2412, 2420, 2423–24, 2449–50.)

[19]. The Court further notes that a reasonable juror could reasonably assume that petitioner and Drips drove the white van to Evelyn's house after the pursuit where the two men switched places before Drips drove the white van away. Petitioner then only had to get into his Camry, which was parked at the curb, and drive Evelyn, her brothers, and anyone else who accompanied him that night to the Blockbuster video store. Petitioner's driving demonstration accounted for this "switch" in vehicles with a 10-second pause at Evelyn's house. (*See* Doc. No. 154 at 33–34.)

Jeremy Coleman across town" is belied by his own evidence. (*Id.* at 7.)

Fifth, the Court rejects petitioner's unsupported contention that he "drove his green Toyota Camry to Blockbuster" rather than the white van. (Pet. PH Brief at 6.) Petitioner ignores the absence of any evidence whatsoever reflecting what vehicle petitioner utilized to arrive at the Blockbuster store. Petitioner did not present any forensic evidence of the videotape reflecting any images of petitioner in the parking lot, and Detective Katz testified at trial that he did not recall that any camera had a view of the parking lot. (4 RT 1893.) Petitioner's citations to the trial record (RT 1612, 2114, 2406, 2411, 2420, 2432 (*see* Pet. PH Brief at 6)) merely reflect trial testimony that petitioner was sitting in his green Camry on 98th Street at the time that others heard the shots fired during the murder.

Sixth, the Court also rejects petitioner's unsupported assertion that he changed clothes before entering the Blockbuster store. (Pet. PH Brief at 7.) The record reflects that the Blockbuster videotape shows petitioner wearing a collarless black shirt with a white shirt underneath. (4 RT 1890–91, 1893; 5 RT 2440–41, 2461, 2465.) This is consistent with the testimony of the eyewitnesses to the shooting, who testified that petitioner was wearing a black t-shirt or sweatshirt both earlier in the day in his Camry prior to the shooting (3 RT 1620, 1627, 1633), and while driving the white van (3 RT 1575, 1617, 1620–21, 1627). Although one witness, Jesse Robles, testified at trial that petitioner was wearing a white t-shirt (2 RT 942, 976), Jesse told sheriff's deputies after the murder that petitioner was wearing a long-sleeved black hooded sweatshirt with the hood down (3 RT 1512;

*see also* Am. Pet., Ex. M at 39 (excerpt of police report)).

Disregarding petitioner's unsupported speculation, petitioner's "new evidence" reflects that petitioner entered the Blockbuster video store at 9:25:34 p.m. according to the time stamp on the videotape. (*See* Pet. PH Brief at 1, Exh. B; Doc. No. 154 at 14–15, 19.) Further, because petitioner's timed driving demonstration illustrated that it would have taken petitioner less than 16 minutes to drive the route that he contends that he took, including making the stops that he contends that he made, petitioner's "new evidence" reflects that petitioner could have arrived at the parking lot of the Blockbuster video store by 9:14 p.m., well before he can be seen on the videotape in the store.

Finally, the probative force of petitioner's "new evidence" must be assessed within the context of the evidence adduced at trial. At trial, petitioner introduced evidence to support that he was with his girlfriend Evelyn, his friend Lennin, and others at the time the shots were fired before he and Evelyn went to the Blockbuster store. In closing, petitioner's counsel made the same argument that petitioner is raising now as his actual innocence claim—that he could not have committed the murder and then have been chased in the opposite direction and still arrive at the Blockbuster store as shown on the videotape. (*See* 5 RT 2755–56, 2759–60.) The jury rejected this alibi evidence in convicting petitioner of first degree murder.

The Court therefore finds that petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him in light of the "new evidence" concerning his earlier arrival time at the Blockbuster store.[20]

---

20. In his Post Hearing Reply, petitioner objects to respondent's assertions that petitioner

has "failed to present any evidence proving that he could not have committed the crime

**4. Comparison to other cases in which the Schlup standard was found to have been met**

The Court's rationale for rejecting petitioner's actual innocence claim also is based on the fact that the "new evidence" on which petitioner is relying here is wholly unlike the "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitnesses accounts, or critical physical evidence," specified by the Supreme Court as being necessary to support a claim of actual innocence. In the few cases the Court has located in which the *Schlup* standard was found to have been met, the "new evidence" consisted of credible new evidence that the petitioner had a solid alibi for the time of the crime, numerous exonerating eyewitness accounts of the crime, DNA evidence excluding the petitioner and identifying another potential perpetrator, a credible confession by a likely suspect explaining that he had framed the petitioner, and/or evidence contradicting the very premise of the prosecutor's case against the petitioner. *See, e.g., House*, 547 U.S. at 521, 528– 29, 540, 548–54, 126 S.Ct. 2064; *Larsen v. Soto*, 742 F.3d 1083, 1086, 1096 (9th Cir. 2013); *Souter v. Jones*, 395 F.3d 577, 581– 84, 591–92, 596 (6th Cir.2005); *Carriger v. Stewart*, 132 F.3d 463, 465, 471, 478 (9th Cir.1997), *cert. denied*, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); *Lisker v. Knowles*, 463 F.Supp.2d 1008, 1018–28

(C.D.Cal.2006); *Garcia v. Portuondo*, 334 F.Supp.2d 446, 455–56 (S.D.N.Y.2004); *Schlup v. Delo*, 912 F.Supp. 448, 451–55 (E.D.Mo.1995).

It is clear from a comparison of petitioner's "new evidence" to the "new evidence" that has been found by other courts to be sufficiently reliable to entitle a habeas petitioner to pass through the *Schlup* gateway and argue the merits of his procedurally defaulted or time barred claims that petitioner's "new evidence" is hardly the type of new, reliable evidence of innocence envisioned by the Supreme Court in *Schlup*. Petitioner's "new evidence" does not scientifically exclude petitioner as the perpetrator, identify another potential perpetrator, present new exonerating eyewitness accounts, or contradict the very premise of the State's case against him.

For example, unlike the "new evidence" in *Larsen*, but similar to that in *Sistrunk v. Armenakis*, 292 F.3d 669 (9th Cir.2002) (finding petitioner failed to make a sufficient showing of his actual innocence to pass through the *Schlup* gateway), petitioner's "new evidence" does nothing to discredit the trial testimony establishing his guilt. In *Sistrunk*, the Ninth Circuit rejected a *Schlup* gateway claim based on "new evidence" that showed that the trial testimony of the state's main expert witness "contained a number of inaccurate statements." Concluding that, even if it were to accept the petitioner's argument

for which he was convicted" and that his "new evidence" does not "demonstrate that he is actually innocent" (citing Resp. PH Brief at 14–15), by asserting that the "standard for the actual innocence exception is less stringent." (Pet. PH Reply Brief at 3–4.) Petitioner is correct that the actual innocence gateway does not require "absolute certainty about petitioner's guilt or innocence." *House*, 547 U.S. at 538, 126 S.Ct. 2064. Petitioner, however, must meet his burden of showing "that it is more likely than not that no reasonable juror would have convicted

him in light of the new evidence." *Schlup*, 513 U.S. at 327, 115 S.Ct. 851; *see also House*, 547 U.S. at 538, 126 S.Ct. 2064 ("A petitioner's burden at the gateway stage is to demonstrate ... that more likely than not any reasonable juror would have reasonable doubt."); *McQuiggin*, 133 S.Ct. at 1928 (petitioner must "persuade[ ] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"). Petitioner has failed to meet this burden.

that the "new evidence" "thoroughly comprises the bolstering effect" of the expert's testimony, the "new evidence" "does nothing to discredit the victim's account of the rape, which was central to establishing guilt." See Sistrunk, 292 F.3d at 676. In contrast, in Larsen, the Ninth Circuit concluded that Larsen's "new evidence," which included testimony from multiple credible witnesses that it was a different person who took the actions that the prosecutor argued supported Larsen's guilt, suggested that "the police were mistaken about the identity" of the perpetrator. Larsen, 742 F.3d at 1098. As distinct from the "new evidence" in Larsen, petitioner's "new evidence" herein does not support a different version of events than that presented by the prosecutor at trial. Rather, as set forth above, petitioner's defense at trial was the same as his actual innocence claim: that the eyewitness identifications were wrong and, based on testimony from several witnesses, he could not have committed the crime and made it to the Blockbuster store by the time shown on the store's videotape. As in Sistrunk, the jury in petitioner's case was afforded a "first-hand opportunity" to see and hear the witnesses who provided the conflicting testimony about petitioner's whereabouts at the time of the shooting. In convicting petitioner of first degree murder, the jury found the testimony of the eyewitnesses who identified petitioner as the driver of the white van more credible than that of petitioner's witnesses who testified that he was with them at Evelyn's house at the time that the shots were fired. Nothing in petitioner's "new evidence" undermines the credibility of the eyewitnesses who identified petitioner as the driver of the white van or casts doubt on the substantial testimony establishing a preexisting relationship between petitioner and Chino's family.

### 5. Conclusion

As Justice O'Connor emphasized in Schlup, the Supreme Court strove to "ensure that the actual innocence exception remains only a safety valve for the extraordinary case." Schlup, 513 U.S. at 333, 115 S.Ct. 851 (O'Connor, J., concurring) (internal quotation marks omitted). Petitioner's is not such a case.

## II. Petitioner's Motion to Amend should be denied with respect to Ground 11 of the proposed Amended Petition because that claim is procedurally defaulted.

The Court's finding that Grounds 11 and 19 relate back to the timely filing of petitioner's original Petition herein is dispositive of respondent's contention in his original opposition to the Motion to Amend that the Motion should be denied with respect to those grounds because they are time barred.

However, respondent also contends that another reason for denying the Motion as to all the additional claims alleged in the Amended Petition (including Grounds 11 and 19) is that amendment would be futile because the additional claims are procedurally defaulted. (See Opp. at 12–14; see also Resp. PH Brief at 28–33.)

 In order for a claim to be procedurally defaulted for federal habeas corpus purposes, the opinion of the last state court rendering a judgment in the case must clearly and expressly indicate that its judgment rests on a state procedural bar. See Harris v. Reed, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); see also Coleman v. Thompson, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Thomas v. Goldsmith, 979 F.2d 746, 749 (9th Cir.1992). Further, "the application of the state procedural rule must provide 'an adequate and independent state law basis' on which the state court

can deny relief." *See Park v. California,* 202 F.3d 1146, 1151 (9th Cir.), *cert. denied,* 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 202 (2000).

 Here, as discussed above, the California Supreme Court's citation of *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993) in its two September 15, 2010 summary denial orders signified that the petitions were being denied for untimeliness. The Court notes that, subsequent to the filing of respondent's original opposition to the Motion to Amend and shortly after the issuance of the February 9, 2011 Report and Recommendation, the Supreme Court held in *Walker v. Martin,* 562 U.S. 307, 131 S.Ct. 1120, 179 L.Ed.2d 62 (2011), that the California Supreme Court's denial of a habeas petition for untimeliness constitutes an adequate and independent state law ground.

In *Walker,* the Supreme Court did acknowledge in a footnote that it also had "recognized a 'limited category' of 'exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.'" *See Walker,* 131 S.Ct. at 1128 n. 4, 131 S.Ct. 1120 (quoting *Lee v. Kemna,* 534 U.S. 362, 376, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)). The Supreme Court noted that, in *Lee,* for example, it had "held inadequate to bar federal review a state court's persnickety application of a rule detailing formal requirements for continuance motions," where "[t]he defendant had substantially complied with the rule's key requirement and flawless compliance would have been unavailing given the trial court's reason for denying the motion." *See id.*

Here, petitioner contends that his claims should not be procedurally barred for the same reasons the Supreme Court found the claims were not procedurally barred in *Lee.* However, petitioner has not even purported to explain what makes this case "exceptional" or why the California Supreme Court's application of California's timeliness rule here was "exorbitant." (*See* Pet. PH Brief at 36–37.) Moreover, the Court finds the Ninth Circuit's decision in *Weaver v. Clark,* 540 Fed.Appx. 668 (9th Cir.2013) both instructive and persuasive on the procedural default issue here. Review of the appellate record in *Weaver* (Ninth Circuit Case No. 12–55423) reflects that the habeas petitioner there had been convicted on June 1, 2005 and that his first state habeas petition containing the ineffective assistance of trial counsel claims that were denied for untimeliness had not been filed until December 30, 2008. In his appeal from the district court's conclusion, based on the Supreme Court's decision in *Walker,* that these claims were procedurally defaulted, the petitioner contended *inter alia* that the claims were not procedurally barred under *Lee* because the state courts "exorbitantly" applied the California timeliness rule in their finding of procedural default. The Ninth Circuit made short shrift of this contention, stating:

> "Considering Weaver's three and one half year delay between his conviction and his habeas petition, his is not an 'exceptional' case involving an 'exorbitant application' of California's timeliness rule. *See Lee v. Kemna,* 534 U.S. 362, 376, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002). Weaver cannot overcome his procedural default." *Weaver,* 540 Fed. Appx. at 668–69.

Petitioner here was convicted on April 28, 2006 and he did not file the habeas petition containing the claims that were denied for untimeliness until March 25, 2010. Thus, the length of the delay here exceeded the length of the delay in *Weaver.* Moreover, unlike the petitioner in *Weaver* who at least advanced a theory in support of his invocation of *Lee* (i.e., that

the state courts had failed to properly consider his explanation for the delay), petitioner here merely has asserted conclusorily that the California Supreme Court's denial of his 2010 petition for untimeliness was an abuse of discretion. If *Weaver* did not constitute an "exceptional" case involving an "exorbitant application" of California's timeliness rule, this case surely doesn't.

█ The Court therefore finds that federal habeas review of Grounds 11 and 19 of the proposed Amended Petition is barred unless petitioner can demonstrate cause for his procedural default and actual prejudice as a result of the alleged violation of federal law. *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546; *Smith v. Baldwin*, 510 F.3d 1127, 1146 (9th Cir.2007), *cert. denied*, 555 U.S. 830, 129 S.Ct. 37, 172 L.Ed.2d 49 (2008); *Bennett*, 322 F.3d at 580; *Park*, 202 F.3d at 1150. To satisfy his burden of demonstrating "cause" for the procedural default, petitioner must show "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Here, petitioner has not even purported to show cause for his procedural default of Grounds 11 and 19 of the proposed

Amended Petition.[21] Because petitioner must demonstrate *both* cause and prejudice (*see Murray*, 477 U.S. at 494, 106 S.Ct. 2639), his failure to establish the requisite "cause" for his procedural default obviates the need for the Court to even reach the issue of whether petitioner has demonstrated the requisite "prejudice" from the procedural default. *See Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).[22]

In the next section, the Court will address petitioner's contention that he qualifies for the equitable exception to the doctrine of procedural default for ineffective assistance of trial counsel claims recognized by the Supreme Court in *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 1318, 182 L.Ed.2d 272 (2012), and *Trevino v. Thaler*, —— U.S. ——, 133 S.Ct. 1911, 1918, 185 L.Ed.2d 1044 (2013). (*See* Pet. PH Brief at 34–36; *see also* Pet. PH Reply Brief at 2–3.) However, this equitable exception to the procedural default doctrine has no applicability to Ground 11 because the exception applies only to defaulted ineffective assistance of trial counsel claims and Ground 11 is an evidentiary error claim. Although the Ninth Circuit recently extended the *Martinez* exception to defaulted ineffective assistance of appellate counsel claims, *see Nguyen v. Curry*, 736

---

**21.** The Court notes that the Supreme Court did state in *Murray* that "constitutionally ineffective assistance of counsel . . . is cause for a procedural default." *Murray*, 477 U.S. at 488, 106 S.Ct. 2639; *see also Bonin v. Calderon*, 77 F.3d 1155, 1158 (9th Cir.), *cert. denied*, 516 U.S. 1143, 116 S.Ct. 980, 133 L.Ed.2d 899 (1996). However, the Supreme Court also stated that a claim of ineffective assistance of counsel must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *See Murray*, 477 U.S. at 489, 106 S.Ct. 2639. Here, petitioner has never presented to the state courts as an independent claim that his appellate counsel rendered ineffective assistance in failing to raise on

direct appeal the evidentiary error claim alleged in Ground 11 of the proposed Amended Petition or the ineffective assistance of trial counsel claim alleged in Ground 19.

**22.** Although the Supreme Court has recognized an actual innocence exception to the cause and prejudice requirement, *see, e.g., Coleman*, 501 U.S. at 750, 111 S.Ct. 2546; *Murray*, 477 U.S. at 496, 106 S.Ct. 2639; *Noltie v. Peterson*, 9 F.3d 802, 806 (9th Cir. 1993), the Court's rejection above of petitioner's actual innocence claim applies with equal force to the actual innocence exception to the cause and prejudice requirement.

F.3d 1287, 1293–95 (9th Cir.2013), it did not extend the *Martinez* exception to any other procedurally defaulted claims. *See also Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir.2013) (holding that the *Martinez* exception did not apply to defaulted *Brady* claim), *cert. denied*, —— U.S. ——, 134 S.Ct. 1771, 188 L.Ed.2d 602 (2014).

The Court therefore recommends that petitioner's Motion to Amend be denied with respect to Ground 11 of the proposed Amended Petition because that claim is procedurally defaulted.

## III. Petitioner's Motion to Amend should be denied with respect to Ground 19 of the proposed Amended Petition because, even if that claim is not procedurally defaulted, it is devoid of merit.

As discussed below, even if Ground 19 of the proposed Amended Petition qualifies for the equitable exception to the doctrine of procedural default for ineffective assistance of trial counsel claims recognized by the Supreme Court in *Martinez*, granting petitioner's Motion to Amend with respect to Ground 19 would be futile because the claim is devoid of merit.

### A. *Ground 19 at least arguably qualifies for the Martinez exception.*

In *Martinez*, an Arizona inmate raised ineffective assistance of trial counsel claims in his federal habeas petition that the State argued were procedurally barred under an Arizona procedural rule precluding relief on a claim that could have been raised in a previous state collateral proceeding. The petitioner did not dispute that this procedural rule was well established. He instead argued that he could

overcome this hurdle to federal review because he had cause for his default, namely that his first postconviction counsel was ineffective in failing to raise any claims in the first collateral proceeding. The district court ruled that Arizona's preclusion rule was an adequate and independent state-law ground to bar federal habeas review and that the petitioner had not shown cause to excuse his procedural default because, under *Coleman*, an attorney's errors in a postconviction proceeding do not qualify as cause for a default. The Ninth Circuit affirmed. *See Martinez*, 132 S.Ct. at 1314–15.

■ The Supreme Court noted that *Coleman* "left open … a question of constitutional law: whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *See Martinez*, 132 S.Ct. at 1315. However, the Supreme Court did not resolve this constitutional question. *See id.* Instead, the Supreme Court "qualifie[d] *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings [23] may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *See id.* The Supreme Court characterized this ruling as an "equitable ruling" as opposed to a "constitutional ruling," and explained that its holding did "not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts," and did "not extend to attorney errors in any proceeding beyond the first occasion the State

---

**23.** The Court defined an "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *See Martinez*, 132 S.Ct. at 1315.

allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *See id.* at 1319–20. The Supreme Court summarized its holding as follows:

> "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1320.

In *Trevino,* the Supreme Court extended the *Martinez* exception to instances where a state's procedural rules did not forbid a defendant from raising an ineffective assistance of counsel claim on direct appeal, but rather make it "highly unlikely that a defendant will have a meaningful opportunity" to raise such a claim. *See Trevino,* 133 S.Ct. at 1921.

 The sole argument made by respondent in response to petitioner's contention that he qualifies for the *Martinez* exception is that, unlike Arizona, California does not have a procedural rule requiring that all ineffective assistance of trial counsel claims be raised by way of a collateral attack in a writ of habeas corpus, and not on direct appeal. Rather, it is only when the determination of an ineffective assistance of trial counsel claim necessitates consideration of matters outside the record on appeal that California requires the claim to be raised on habeas corpus. (*See* Resp. PH Brief at 32–33.) Respondent is correct. *See, e.g., People v. Mendoza Tello,* 15 Cal.4th 264, 266–67, 62 Cal.Rptr.2d 437, 933 P.2d 1134 (1997); *People v. Wilson,* 3 Cal.4th 926, 936, 13 Cal.Rptr.2d 259, 838 P.2d 1212 (1992). Thus, for example, in *People v. Anderson,* 25 Cal.4th 543, 568–

70, 106 Cal.Rptr.2d 575, 22 P.3d 347 (2001), the California Supreme Court considered on the merits an ineffective assistance of trial counsel claim that had been raised on direct appeal.

 Here, the Court notes that petitioner's claim in Ground 19 (i.e., that trial counsel provided ineffective assistance by failing to make a motion to exclude Renteria's "suggestive" and/or tainted in-court identification testimony) is based on (a) the fact that petitioner "was the only person who sat next to counsel in court" and (b) the same facts underlying petitioner's claims in Grounds 1 and 2 of his original Petition (which correspond to Grounds 1–3 of his Amended Petition). (*See* Am. Pet. at 6e; *see also* Am. Pet. Attach. at 187–209.) However, the Court further notes that petitioner did not raise claims corresponding to Grounds 1–3 of his Amended Petition on direct appeal, but rather in his habeas petition filed concurrently with his direct appeal. (*See* LD F.) Moreover, petitioner's Grounds 1–3 of his Amended Petition were based on matters outside the record on appeal, including excerpts from Renteria's testimony at the subsequent trial of Abel Soto (who was convicted of being the shooter in the murder of Jose Robles) and photographic exhibits from the Soto trial, which petitioner attached as exhibits to his Court of Appeal habeas petition. (*See* LD F, Exhs. A–G.)

The Court therefore finds that Ground 19 of the proposed Amended Petition could not have been raised by petitioner on direct appeal. Moreover, for purposes of the *Martinez* exception, the Court finds that Ground 19 on its face constitutes "a substantial claim of ineffective assistance at trial." However, as discussed in subsection B below, the record before the Court is sufficiently developed for the Court to find that Ground 19 is devoid of merit.

## B. *Ground 19 is devoid of merit.*

As a preliminary matter, the Court notes that, since there was no state court adjudication on the merits of Ground 19, the Court's consideration of it is not subject to the deferential AEDPA standard of review. Rather, the Court's consideration of the merits of this claim is subject to de novo review. *See, e.g., Tanner v. McDaniel,* 493 F.3d 1135, 1139 (9th Cir.), *cert. denied,* 552 U.S. 1068, 128 S.Ct. 722, 169 L.Ed.2d 565 (2007); *Chaker v. Crogan,* 428 F.3d 1215, 1220–21 (9th Cir.2005), *cert. denied,* 547 U.S. 1128, 126 S.Ct. 2023, 164 L.Ed.2d 780 (2006); *Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir.2002), *cert. denied,* 539 U.S. 916, 123 S.Ct. 2286, 156 L.Ed.2d 132 (2003); *see also Carter v. Scribner,* 412 Fed.Appx. 35, 38 (9th Cir. 2011).

### 1. *Governing law*

In *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice." "Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. To show "deficient performance," petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. Further, petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judg-ment." *Id.* The Court must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Id.* The Supreme Court in *Strickland* recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. 2052. Accordingly, to overturn the strong presumption of adequate assistance, petitioner must demonstrate that "the challenged action cannot reasonably be considered sound trial strategy under the circumstances of the case." *See Lord v. Wood,* 184 F.3d 1083, 1085 (9th Cir.1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000).[24]

To meet his burden of showing the distinctive kind of "prejudice" required by *Strickland,* petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Richter,* 131 S.Ct. at 791 ("In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (noting that the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the

---

24. Because the standard for "deficient performance" is an objective one, a reviewing court is not confined to evidence of counsel's subjective state of mind, "[a]lthough courts may not indulge [in] 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *See Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 790, 178 L.Ed.2d 624 (2011).

trial unreliable or the proceeding fundamentally unfair").

## 2. *Analysis*

 Petitioner claims that Renteria's identification was "suggestive and/or tainted" because she first identified petitioner in court, three years after the crime, when he was "the only person who sat next to counsel." (Am. Pet. Attach. at 187.) Petitioner asserts that Renteria's testimony indicates that her observation of the white van was from such a distance that her identification was impossible and that she falsely claimed that "no big vehicles" were parked in front of her so that she could see the driver of the white van. (*Id.* at 187, 204–05.) Although petitioner contends that trial counsel was ineffective for failing to move to "exclude the false testimony of Renteria," he argues that "[a]fter petitioner's conviction, it was discovered that Renteria's van was parked behind a large dump working [sic] truck and several other vehicles, which proves her identification was impossible and her statements was [sic] false." (*Id.* at 188, *see also* 193–94, 205–06 (citing to exhibits and excerpts from the subsequent trial of Soto (Exhs. A, E–G to the Am. Pet.)).) Petitioner further contends that he suffered prejudice because "Renteria's false identification evidence contributed to his conviction and the prosecutor repeatedly emphasized to the jury that four witnesses identified petitioner as the driver and Renteria was one of those witnesses." (*Id.* at 189–90.) Petitioner argues that, "[h]ad Renteria's identification of petitioner been discredited as her identification of the shooter was discribed [sic] at Soto's trial, there is a reasonable probability that the jury would have reached a more favorable result." (*Id.* at 192.)

As the Court previously found in rejecting petitioner's related ineffective assistance of counsel claim in Ground 2 concerning counsel's alleged failure to investigate and produce evidence that it would have been impossible for Renteria to see the driver, the record reflects that counsel conducted extensive cross examination of Renteria that highlighted problems with her testimony in general and with her in-court identification of petitioner in particular. Counsel also argued in closing that Renteria would not have been able to identify petitioner under the circumstances, that her description of the shooting was inconsistent with that of the other witnesses, that her in-court identification of petitioner was unreliable, and that Renteria was biased because she knew the victim. (*See* Doc. No. 63 at 34–35.) Finally, because the credibility of Renteria's tentative in-court identification of petitioner was called into question during trial, her testimony was not reasonably likely to have carried more weight with the jury than those of the other three eyewitnesses, each of whom identified petitioner by name to the police and also positively identified petitioner in court. Accordingly, the Court finds that petitioner has failed to meet his burden of showing a reasonable probability that, but for counsel's failure to move to exclude Renteria's testimony, petitioner would not have been convicted of first degree murder. This finding renders it unnecessary even to address whether petitioner has made the requisite showing of deficient performance. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."); *Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir.2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other."); *Williams v. Calderon,* 52 F.3d 1465, 1470 & n. 3 (9th Cir.1995), *cert. denied,* 516

U.S. 1124, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996) (disposing of an ineffective assistance of counsel claim without reaching the issue of deficient performance because petitioner failed to make the requisite showing of prejudice).

The Court therefore recommends that petitioner's Motion to Amend be denied with respect to Ground 19 of the proposed Amended Petition because that claim is devoid of merit.

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Supplemental Report and Recommendation; (2) denying petitioner's Motion to Amend with respect to Grounds 10–21 of the proposed Amended Petition; and (3) dismissing this action with prejudice.